# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## JANETSKY v COUNTY OF SAGINAW

Docket Nos. 166477 and 166478. Argued on application for leave to appeal January 22, 2025. Decided July 25, 2025.

Jennifer Janetsky filed an action in the Saginaw Circuit Court against Saginaw County, the Saginaw County Prosecutor's Office, John McColgan, and Christopher Boyd alleging violations of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, violations of public policy, assault and battery, intentional infliction of emotional distress, and false imprisonment. Janetsky was an assistant prosecuting attorney in the Saginaw County Prosecutor's Office, where McColgan was the elected prosecuting attorney and Boyd was the chief assistant prosecuting attorney. Janetsky was assigned to prosecute Justin Hannahs, who was charged with first- and third-degree criminal sexual conduct and other offenses. Without Janetsky's knowledge, Boyd met with Hannahs's attorney and negotiated a plea agreement that required Hannahs to plead guilty to one count of third-degree criminal sexual conduct (CSC-III) in exchange for the dismissal of the other charges and a sentencing recommendation of up to one year in jail and probation.

When Janetsky learned of the deal, she reported to McColgan her concern that the sentencing recommendation violated MCL 777.1(1) because it included a term of probation, which Janetsky believed was impermissible under the statute as a punishment for CSC-III. With McColgan's consent, Janetsky met with Boyd to discuss her concerns and her proposal to withdraw the sentencing recommendation. Boyd disagreed that the sentencing recommendation violated the statute, but he ultimately signed a motion drafted by Janetsky to withdraw the sentencing recommendation; the trial court granted the motion, and Hannahs withdrew his plea. Janetsky alleged that Boyd was angry and resentful over the incident, which led to several instances of retaliation, including a confrontation in Boyd's office during which he became agitated, blocked the door as Janetsky attempted to leave, and struck the door with his hand as Janetsky held the door handle. McColgan and the Saginaw County controller conducted an investigation, and McColgan placed Janetsky on administrative leave. Janetsky later resigned, citing a hostile and abusive work environment.

After Janetsky filed this action, defendants sought summary disposition. The trial court, Gerald M. Prill, J., granted summary disposition to the Saginaw County Prosecutor's Office on all claims; granted summary disposition to all defendants on the claim of intentional infliction of emotional distress; granted summary disposition to McColgan on Janetsky's intentional-tort

claims; and otherwise denied the motion. Defendants appealed, and in an unpublished per curiam opinion issued on April 23, 2020 (Docket Nos. 346542 and 346565), the Court of Appeals, FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ., reversed the trial court's judgment in part and ordered it to grant summary disposition in favor of all defendants on the remaining claims. Janetsky appealed in the Supreme Court, which reversed in part and remanded to the Court of Appeals to consider the issues raised by defendants but not considered by the Court of Appeals. 510 Mich 1104 (2022).

On remand, in an unpublished per curiam opinion issued on September 28, 2023, the Court of Appeals, BOONSTRA, P.J., and M. J. KELLY, J. (GLEICHER, C.J., concurring in part and dissenting in part), reversed in part on different grounds and ordered the trial court to grant summary disposition under MCR 2.116(C)(10) of the intentional-tort and public-policy claims in favor of all remaining defendants and of the WPA claim in favor of Saginaw County. Janetsky again sought leave to appeal in the Supreme Court, and the Court ordered and heard oral argument on the application. 513 Mich 1052 (2024).

In an opinion by Justice THOMAS, joined by Chief Justice CAVANAGH and Justices BERNSTEIN, WELCH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

The Court of Appeals erred by reversing the trial court's denial of defendants' motion for summary disposition. First, Saginaw County was subject to suit under the WPA as Janetsky's employer under the statutory definition of "employer." Second, a plaintiff may raise a claim of wrongful termination in violation of public policy based on an attempt to prevent or remedy a violation of law if they can show (1) that the law was or would have been violated, (2) that they reasonably and in good faith believed they were remedying or preventing a violation of law, and (3) that their actions regarding the alleged violation were the basis for an adverse employment action; the case was remanded to the trial court to apply this test in the first instance and determine whether Janetsky's claim survives summary disposition. Finally, the record demonstrated the existence of genuine issues of material fact sufficient to defeat defendants' motion for summary disposition as to the intentional-tort claims; the length of time Janetsky was detained by Boyd— who lacked lawful authority to detain her—was immaterial to liability for false imprisonment, and Janetsky set forth specific facts that were sufficient to establish the necessary elements of an assault and that could allow a jury to find that Boyd intended to either commit a battery or to create in Janetsky a reasonable fear or apprehension of an immediate battery.

1. Under MCL 15.362 of the WPA, an employer is prohibited from retaliating against an employee on the basis that the employee has reported or is about to report a violation or suspected violation of the law. Saginaw County argued that it could not be liable under this provision because it did not have an employer-employee relationship with Janetsky. However, nothing in the WPA requires that a specific form of relationship exist for a defendant to be an "employer" that may be sued under the WPA. Instead, the statute defines "employer" as a person who has one or more employees, and the parties did not contest that Saginaw County fit this definition. Rather than rely on the statutory definition, the Court of Appeals erred by using the economic-reality test to determine that Saginaw County was not Janetsky's employer. The Supreme Court adopted this test to distinguish between employees and independent contractors under the Worker's Disability Compensation Act, MCL 418.101 *et seq*., and the Court of Appeals later also adopted it to

distinguish between employees and independent contractors under the WPA. Neither party argued that Janetsky was an independent contractor in her role as an assistant prosecutor, and the county conceded that it and the elected prosecutor were Janetsky's "co-employers" under the relevant labor agreement. Therefore, the economic-reality test was not applicable.

2. This Court previously determined that Janetsky's claim of wrongful termination in violation of public policy was not preempted by the WPA because it was factually distinct from her WPA claim, given that the public-policy claim was not based on Janetsky's report of a violation or suspected violation of the law, and this Court had directed the Court of Appeals to consider on remand whether the public-policy claim had other legal or factual bases. However, the Court of Appeals framed the relevant inquiry as whether Janetsky had refused to violate the law and determined that she had not, but it failed to consider that there were other legal bases that may support an employee's claim that their employer violated public policy by terminating their employment. Broadly stated, a cause of action may be brought for wrongful termination in violation of public policy if it would protect employees for performing an action that public policy would encourage or refusing to perform an action that public policy would condemn, where "public policy" means policies that are reflected in our state and federal Constitutions, our statutes, and the common law. This tort requires a balancing of interests out of respect for the reciprocal rights of employers and employees. Accordingly, in order to survive summary disposition, a plaintiff asserting this claim must make a prima facie showing (1) that the law was or would have been violated, (2) that they reasonably and in good faith believed they were remedying or preventing a violation of law, and (3) that their actions regarding the alleged violation were the basis for an adverse employment action.

In this case, Janetsky's public-policy claim implicated MCL 771.1(1), which is a formal legislative expression of the state's public policy that allows a court, with limitations, to sentence an offender to probation in lieu of a harsher sentence otherwise permitted by law. Janetsky's claim also implicated the traditional role of a prosecutor to ensure compliance with the law. Discharging a prosecutor for seeking to preserve the legal and procedural integrity of a criminal prosecution undermines the Legislature's sovereign power, the role of a prosecutor, and the public's confidence in the criminal justice system. Janetsky claimed that she was constructively discharged for her efforts to bring a defendant's plea agreement into compliance with MCL 771.1(1), but it would be premature for this Court to decide whether her claim should survive summary disposition. Remand was appropriate for the trial court to apply the test announced by this Court and to determine whether a genuine issue of material fact existed concerning whether (1) MCL 771.1(1) was or would have been violated, (2) Janetsky reasonably and in good faith believed she was remedying or preventing a violation of law, and (3) Janetsky's actions regarding the alleged violation were the basis for an adverse employment action.

3. To establish a claim of false imprisonment, a plaintiff must show that (1) the defendant committed an act with the intention of confining another, (2) the act directly or indirectly resulted in such confinement, and (3) the plaintiff was conscious of the confinement. The parties did not dispute that Boyd acted with the intent to keep Janetsky in his office and that she was prevented from leaving. But the parties disputed whether the confinement was long enough to be actionable and whether Boyd had authority to confine Janetsky. Contrary to the conclusion of the Court of Appeals that the confinement was not long enough to be actionable, the length of time one is

confined is not dispositive, although it may be relevant to the amount of damages awarded by the fact-finder. False imprisonment is a dignitary tort, the aim of which is to protect a person's dignity. A defendant interferes with a person's autonomy and dignity by robbing them of agency over their physical location, even if the confinement is brief. Viewing the evidence in the light most favorable to Janetsky, there was a genuine issue of material fact regarding her confinement and her consciousness of the confinement. Additionally, although Boyd argued that as Janetsky's supervisor, he possessed authority as an agent of the employer to detain her in his office for a supervisory critique, he failed to meet his burden to prove his lawful authority, and there was no authority for his assertion.

4. A claim of assault is established when the defendant attempts to commit a battery or commits an unlawful act that places another in reasonable apprehension of receiving an immediate battery. The defendant must possess the apparent present ability to accomplish the contact, and the plaintiff must establish that the defendant had either an intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery. Janetsky alleged that Boyd committed a battery when he applied force to his office door to prevent her from leaving. Battery—a dignitary tort—is an intentional, unconsented, and harmful or offensive touching of another person or of something so closely connected with the person that interference with the object would engender similar offense as touching the person directly, such as when the object is physically held in the victim's sole possession. The record alleged that Boyd was physically close to Janetsky, had been angry with her and agitated during the meeting, and moved his hand past her head in an aggressive manner to strike the door. Therefore, Janetsky set forth specific facts sufficient to establish the necessary elements of an assault and that could allow a jury to find the requisite intent. Further, Janetsky claimed that she was grabbing the door handle, was physically proximate to it, had some level of control over it, could feel the vibration in it when Boyd slammed the door, and may have been in the process of opening the door when Boyd made contact with it. Janetsky's allegations, if true, brought the door into the realm of objects held in the victim's sole physical possession. Therefore, Janetsky established genuine issues of material fact regarding her claim of assault and battery.

Judgment of the Court of Appeals reversed as to Parts III(A), III(B), and III(D) and vacated as to Part IV, and case remanded to the trial court for further proceedings.

Justice WELCH, concurring, joined the majority opinion in full but wrote separately to explain her vote as to Part III(B) in light of her partial dissent from the Court's previous decision in this case. In *Janetsky v Saginaw Co*, 510 Mich 1104 (2022) (*Janetsky II*), the majority explicitly determined that Janetsky's public-policy claim was factually distinct from her WPA claim and that those factual allegations did not fall within the scope of the conduct covered by the WPA; therefore, the WPA did not provide the exclusive remedy for Janetsky's claim. However, in her statement dissenting in part from the majority in *Janetsky II*, Justice WELCH concluded that the WPA provided the exclusive remedy for Janetsky's claim, so her public-policy claim could not survive. Under the law-of-the-case doctrine, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals and the appellate court in subsequent appeals. Accordingly, although Justice WELCH would not have reached the issue concerning the public-policy claim if her position in *Janetsky II* had prevailed, she concurred in the majority opinion because it was appropriate to review the question currently before the Court.

Justice ZAHRA, concurring in part and dissenting in part, agreed with the majority's conclusion that Saginaw County was Janetsky's employer under the WPA but would affirm the Court of Appeals' dismissal of Janetsky's public-policy claim and intentional-tort claims. Justice ZAHRA disagreed with the majority's decision to create a new rule expanding common-law public-policy employment claims to include claims of workplace retaliation arising from an employee's actions to ensure that their employer complied with that employee's subjective understanding of the law. The Court of Appeals did not find any legal merit in Janetsky's claims, including her assertion in the underlying case that Hannahs's plea agreement was improper under MCL 771.1(1); nor was there any basis to conclude that Boyd's sentencing recommendation was inconsistent with public policy. Janetsky did not establish that she had been asked to violate MCL 771.1(1), because, as the Court of Appeals explained, that statute does not prohibit a prosecutor from offering a plea and sentencing agreement involving probation. Rather, the statute—which only the trial court can violate—merely provides that defendants convicted of third-degree criminal sexual conduct cannot be sentenced to probation. A sentence of probation with jail time, which Hannahs was offered by Boyd, was distinguishable from a sentence solely of probation; further, the statute did not require a prison sentence, contrary to Janetsky's assertion. Janetsky did not show that her understanding of MCL 771.1(1) was reasonable; therefore, it followed that her assertion that the plea deal violated MCL 771.1(1) also was not reasonable. Justice ZAHRA also disagreed that there was a material question of fact regarding the second element of the public-policy claim created by the majority, i.e., whether Janetsky reasonably and in good faith believed that she was remedying or preventing a violation of law. Janetsky's position was premised on a cursory and myopic reading of MCL 771.1(1), and she advocated against the position of Boyd and, by extension, McColgan, without conducting any research into whether Michigan courts had previously interpreted this statutory provision in the context presented in this case. Lastly, Justice ZAHRA would have also affirmed the Court of Appeals' conclusions regarding Janetsky's intentional-tort claims. The facts did not support a claim of false imprisonment because Janetsky never asked Boyd to let her leave his office and never attempted to open the office door, and she stayed in the office for a lengthy conversation after Boyd complied with her demand for the presence of her union representative. Her assault and battery claim likewise lacked merit. First, there was no dispute that Boyd intended to hold the door shut; he did not touch the door to batter Janetsky, and he never touched her or directed his conduct toward her person. Second, Janetsky did not claim that Boyd's act of holding the door itself was the basis of an attempted battery or an unlawful act that placed another in reasonable apprehension of receiving an immediate battery. Moreover, Boyd's act of merely touching a door, even if Janetsky could feel the "vibration" in the handle when Boyd touched the door, was not sufficient to establish a battery.

Justice HOOD did not participate because the Court considered this case before he assumed office.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 25, 2025

S T A T E   O F   M I C H I G A N

SUPREME COURT

JENNIFER JANETSKY,

      Plaintiff-Appellant,

v                                      No. 166477

COUNTY OF SAGINAW and
CHRISTOPHER BOYD,

      Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE and JOHN MCCOLGAN,

      Defendants.

---

JENNIFER JANETSKY,

      Plaintiff-Appellant,

v                                      No. 166478

COUNTY OF SAGINAW, JOHN
MCCOLGAN, and CHRISTOPHER BOYD,

       Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE,

       Defendant.

_____

BEFORE THE ENTIRE BENCH (except HOOD, J.)

THOMAS, J.

This case arises out of Jennifer Janetsky's employment as an assistant prosecuting attorney (APA) with the Saginaw County Prosecutor's Office. Specifically, Janetsky's claims arise out of her handling of a criminal sexual conduct prosecution that was assigned to her and the alleged actions defendants took against Janetsky in response to her handling of that case.

Three issues are currently before this Court. The first is whether Saginaw County was an "employer" under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., that can be sued for the alleged misconduct within the Saginaw County Prosecutor's Office. The second is whether Janetsky can state a claim for wrongful termination in violation of public policy. And the third is whether genuine issues of material fact exist to defeat defendants' motion for summary disposition as to Janetsky's claims of false imprisonment and assault and battery. The Court of Appeals answered each question in the negative and ordered the grant of summary disposition on each claim in favor of defendants.

We hold that the Court of Appeals erred by ordering the trial court to grant summary disposition. First, Saginaw County fits the definition of an "employer" under the statutory language in the WPA, and the Court of Appeals erred by using the economic-reality test to determine whether Saginaw County is an employer. Second, we hold that a plaintiff can state a claim for wrongful termination in violation of public policy where they allege that they were terminated based on their actions to prevent or remedy a violation of the law. Because the trial court and the parties did not have the benefit of the test we provide today, we remand to the trial court to consider in the first instance the question of whether there is a genuine issue of material fact under MCR 2.116(C)(10) regarding Janetsky's claim of wrongful termination. Third, the circumstances presented are sufficient to allow the jury to consider Janetsky's intentional-tort claims. We therefore reverse Parts III(A), III(B), and III(D) of the Court of Appeals' decision on remand, vacate Part IV of that opinion, and remand this case to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. FACTS

Janetsky was an APA with the Saginaw County Prosecutor's Office until she resigned in December 2015. Janetsky claims that the working conditions alleged in her complaint rendered her resignation a constructive discharge. Defendant John McColgan was the elected prosecuting attorney of Saginaw County, and defendant Christopher Boyd was the chief assistant prosecuting attorney. McColgan was Boyd's direct supervisor, and Boyd was Janetsky's direct supervisor.

In October 2013, Boyd assigned Janetsky to prosecute Justin Hannahs, who was charged with one count of first-degree criminal sexual conduct, three counts of third-degree

3

criminal sexual conduct, and one count each of extortion and using a computer to commit a felony. During the pendency of the case, Janetsky rebuffed attempts to negotiate a plea agreement that did not require Hannahs to plead guilty to first-degree criminal sexual conduct. Without Janetsky's knowledge, Boyd met with Hannahs's attorney to negotiate a plea agreement. Boyd and Hannahs ultimately agreed to a plea that would require Hannahs to plead guilty to one count of third-degree criminal sexual conduct in exchange for the dismissal of all other charges and a sentencing recommendation of up to one year in jail and probation.

On May 30, 2014, Janetsky began a week-long vacation to get married and go on her honeymoon. She received calls while on her honeymoon from the reporting victims alerting her to the agreement that Boyd had struck with Hannahs. Upon returning to work, she discovered the terms of Hannahs's plea. Janetsky believed the agreement violated MCL 771.1(1) because the sentencing recommendation contained a term of probation. MCL 771.1(1) allows a sentence of probation in lieu of the legally mandated punishment in certain circumstances, but it explicitly excepts third-degree criminal sexual conduct.

Janetsky reported her concerns about the plea to McColgan, who agreed to allow her to take corrective action. Janetsky then met with Boyd to discuss her concerns and her proposed solution to withdraw the sentencing recommendation. Boyd disagreed that the sentencing recommendation violated MCL 771.1(1). In his view, MCL 771.1(1) only precludes a "straight" probationary term, i.e., a term of probation without any term of incarceration, and the sentencing agreement with Hannahs was lawful because it would impose both a term of probation *and* a jail sentence. Janetsky disagreed with Boyd's analysis, and Boyd became angry with her insistence that the sentencing recommendation

4

be withdrawn. However, he ultimately signed the motion that Janetsky drafted to withdraw the sentencing recommendation on the basis that it was "unlawful" under MCL 771.1(1), and the trial court granted that motion. In response, Hannahs withdrew his plea. According to Janetsky, Boyd remained resentful and harbored anger toward her from that point forward, leading to numerous instances of retaliation.[1]

One such incident occurred when Boyd and Janetsky were discussing a different case. Boyd had closed the door to his office and demanded that Janetsky sit down. When she refused, Boyd's face became red, and he became more agitated. Janetsky said that she would not speak to Boyd further without her union representative and began to leave the room.

Boyd got up from his desk while yelling and, according to Janetsky, "came flying out from behind the desk, very quickly came behind me, . . . [and p]ut his hand on the door and blocked my exit." Janetsky claims that her hand was on the handle when Boyd made contact with the door and that she "could feel . . . the slam—the bang of the door." After this, Boyd was so close to Janetsky that she could "feel his [breath]." Boyd allegedly blocked the door for about 30 seconds before opening it to call for Janetsky's union representative. Janetsky testified during her deposition that she feared for her safety during

---

[1] Janetsky alleges multiple forms of mistreatment that ultimately led her to resign. Defendants object to her characterization of many of these events. However, we address here only those that are necessary to resolve the questions now before this Court. Moreover, we view the facts in the light most favorable to Janetsky, as the nonmovant, under MCR 2.116(C)(10). See *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 397; 572 NW2d 210 (1998).

the confrontation: "I was fearful that I was going to have to fight my way out of the room, so I did begin to think about how I would fight my way out."

It was reported that Boyd continued to yell at Janetsky with her union representative in the room. Janetsky stated that, at some point, she told Boyd she felt he was treating her in a hostile manner because of what had happened with the Hannahs case. According to Janetsky, Boyd replied, "[Y]ou're damn right, you embarrassed me." Shortly thereafter, Boyd took Janetsky off the Hannahs case and reassigned it to another APA.

Janetsky would go on to write a letter to McColgan alleging a hostile working environment and requesting that he investigate Boyd's behavior. She also met with Saginaw County's personnel director to discuss the situation. This resulted in an investigation, coordinated between McColgan and the Saginaw County controller, and McColgan's placing Janetsky on administrative leave. Janetsky ultimately resigned and alleged that the "hostile and abusive work environment" perpetuated by Boyd caused her disabling stress.

## B. PROCEDURAL HISTORY

Janetsky filed the instant action against Saginaw County, the Saginaw County Prosecutor's Office, McColgan, and Boyd.[2] Defendants jointly moved for summary disposition on the relevant claims under MCR 2.116(C)(10). The trial court declined to grant summary disposition on the WPA and public-policy claims against all defendants and the remaining tort claims as to Boyd and Saginaw County.

---

[2] The Saginaw County Prosecutor's Office was dismissed from the case for other reasons not relevant here.

Defendants appealed in the Court of Appeals, which reversed the trial court's decision in part and ordered it to grant summary disposition in favor of all defendants on the remaining claims. *Janetsky v Saginaw Co*, unpublished per curiam opinion of the Court of Appeals, issued April 23, 2020 (Docket Nos. 346542 and 346565), pp 1, 10 (*Janetsky I*). We reversed in part and remanded to the Court of Appeals to consider issues that defendants had raised but that it had failed to reach. *Janetsky v Saginaw Co*, 510 Mich 1104, 1104-1106 (2022) (*Janetsky II*). On remand, the Court of Appeals reversed in part the decision of the trial court on different grounds and ordered the grant of summary disposition on the tort and public-policy claims in favor of all defendants and on the WPA claim as to Saginaw County. *Janetsky v Saginaw Co (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued September 28, 2023 (Docket Nos. 346542 and 346565), pp 1, 9, 11 (*Janetsky III*). Chief Judge GLEICHER concurred in part and dissented in part. *Id.* (GLEICHER, C.J., concurring in part and dissenting in part), unpub op at 1, 10.

Janetsky subsequently sought leave to appeal in this Court. We ordered oral argument on the application and directed the parties to file supplemental briefing addressing

> (1) whether the Court of Appeals properly determined that Saginaw County was not the plaintiff's employer for purposes of her Whistleblowers' Protection Act, MCL 15.361 *et seq.*, claim; (2) whether the plaintiff's alleged efforts to bring a criminal prosecution into compliance with MCL 771.1 gave rise to a common-law claim for termination in violation of public policy as recognized by *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 694-695[; 316 NW2d 710] (1982); and (3) whether the plaintiff established the existence of a genuine issue of material fact regarding her intentional tort claims of false imprisonment and assault and battery. [*Janetsky v Saginaw Co*, 513 Mich 1052, 1052 (2024).]

7

## II. STANDARD OF REVIEW

The trial court granted summary disposition to defendants under MCR 2.116(C)(10). Summary disposition is appropriate if, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "[T]he trial court views affidavits and other documentary evidence in the light most favorable to the nonmoving party." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 397; 572 NW2d 210 (1998). This Court reviews the trial court's decision de novo. *Id*.

## III. ANALYSIS

### A. WHISTLEBLOWERS' PROTECTION ACT

First, we address whether Saginaw County is Janetsky's employer such that it is susceptible to her WPA claims. This is an issue of statutory interpretation. " 'We interpret the words in the statute in light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole.' " *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (brackets omitted), quoting *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011); see also, e.g., *Dudewicz v Norris Schmid, Inc*, 443 Mich 68, 74-75; 503 NW2d 645 (1993) (recognizing the breadth of the WPA's protection based on a "plain reading"). Moreover, this Court is bound by statutory definitions enacted by the Legislature. *People v Butka*, ___ Mich ___, ___; ___ NW3d ___ (July 22, 2024) (Docket No. 164598); slip op at 7 (" 'When a statute specifically defines a given term, that definition alone controls.' "), quoting *Kuznar v Raksha Corp*, 481 Mich 169, 176; 750 NW2d 121 (2008). " 'The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory

8

language.' " *Butka*, ___ Mich at ___; slip op at 7, quoting *American Civil Liberties Union of Mich v Calhoun Co Sheriff's Office*, 509 Mich 1, 8; 983 NW2d 300 (2022).

The WPA, which protects whistleblowing employees from retaliation, states as follows:

> *An employer* shall not discharge, threaten, or otherwise discriminate against *an employee* regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [MCL 15.362 (emphasis added).]

Saginaw County contends, and the Court of Appeals agreed, that the county cannot be liable under this provision because it did not have an employer-employee relationship with Janetsky. See *Janetsky III*, unpub op at 8-9. In coming to this conclusion, the Court of Appeals relied on the independence of county prosecutors under Const 1963, art 7, § 4, and MCL 49.35, among other statutes, in concert with the "economic-reality test." See *Janetsky III*, unpub op at 8-9. This was an error.

The Legislature defined "employee" and "employer" as used in the WPA as follows:

> (a) "Employee" means a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied. Employee includes a person employed by the state or a political subdivision of the state except state classified civil service.
>
> (b) "Employer" means a person who has 1 or more employees. Employer includes an agent of an employer and the state or a political subdivision of the state. [MCL 15.361.]

9

Accordingly, the WPA prohibits a "person who has 1 or more employees" from retaliating against "a person who performs a service for wages or other remuneration under a contract of hire," MCL 15.361, "regarding [that person's] compensation, terms, conditions, location, or privileges of employment" on account of protected activity, MCL 15.362. Nothing in the WPA requires a specific form of relationship to exist for a defendant to be an "employer" that is susceptible to suit under the WPA. Rather, Saginaw County need only have "1 or more employees" to be considered an "employer" under the WPA. See MCL 15.361(b) and MCL 15.362. The parties do not contest that Saginaw County fits the statutory definition of an "employer" because it has at least one employee.

The Court of Appeals erred by ignoring the text of the statute and, instead, relying on the economic-reality test to determine whether Saginaw County was Janetsky's "employer" under the WPA. This Court adopted the economic-reality test to "distinguish between employees and independent contractors" under the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq. Hoste v Shanty Creek Mgt, Inc*, 459 Mich 561, 571-572; 592 NW2d 360 (1999).[3] The Court of Appeals has since also adopted it to distinguish between employees and independent contractors in applying the WPA. See, e.g., *Chilingirian v City of Fraser*, 194 Mich App 65, 69-70; 486 NW2d 347 (1992) ("We

---

[3] See also *Tata v Muskovitz*, 354 Mich 695, 699; 94 NW2d 71 (1959) (adopting the test from Justice SMITH's dissent in *Powell v Employment Security Comm*, 345 Mich 455, 462; 75 NW2d 874 (1956)). This test has since been partially superseded by statute in the WDCA context, as this Court explained in *Hoste*, 459 Mich at 572 ("This common-law-based approach was appropriate until the Legislature, as it of course has the authority to do, chose to speak about who was an independent contractor by amending § 161 [of the WDCA], in 1985, . . . to define more completely the term 'employee.' The new language, in superseding the old economic realities test, incorporated some, but not all the factors of the old test.") (citation omitted).

are of the opinion that although the trial court correctly concluded that plaintiff was an independent contractor not afforded the protection of the WPA, it utilized the wrong test in reaching this result. . . . The test to be employed is one of 'economic reality.' ") (citation omitted). As this Court has stated, however, "the common-law economic realities test cannot be used to supersede [a] statute[.]" *Hoste*, 459 Mich at 572.

Neither party contends that Janetsky was an independent contractor in her role as an APA.[4] Indeed, Saginaw County concedes that it and the elected prosecuting attorney were Janetsky's co-employers for other employment-law purposes in light of the relevant labor agreement, which defines " 'Employer' or 'Co-Employer' " as including the "Saginaw County Board of Commissioners." Accordingly, the economic-reality test is inapplicable here.[5] Rather, the WPA's plain text establishes that Saginaw County was Janetsky's employer, such that it is subject to suit.

---

[4] Accordingly, it is unnecessary to decide in this case whether the economic-reality test should be used to determine if a worker classified as an independent contractor is covered by the protections of the WPA.

[5] Saginaw County argues that applying the statutory definition of "employer" as written could result in employees suing wholly unrelated employers on the basis of the retaliatory behavior of others. However, as we have explained previously regarding a plaintiff's burden of proof under the WPA,

> [t]he plaintiff must show that (1) he was engaged in protected activity as defined by the act, (2) the defendant [retaliated against] him, and (3) a causal connection exists between the protected activity and the discharge. [*Chandler*, 456 Mich at 399.]

In short, a plaintiff must "demonstrat[e] that his employer took adverse employment action *because of* his protected activity." *Whitman v City of Burton*, 493 Mich 303, 320; 831 NW2d 223 (2013). Saginaw County does not address, nor can we see, how a plaintiff-employee could satisfy this burden against an employer who lacked any relationship with

11

### B. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

Next, we consider whether Janetsky has a viable claim for wrongful termination in violation of public policy. We recently reaffirmed the general rule that "an employee subject to an at-will employment contract may be terminated at any time for any reason." *Stegall v Resource Technology Corp*, ___ Mich ___, ___; ___ NW3d ___ (July 22, 2024) (Docket No. 165450); slip op at 8. However, "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski*, 412 Mich at 695.[6]

In *Janetsky II*, this Court concluded that Janetsky's claim of wrongful termination in violation of public policy was not preempted by the WPA. *Janetsky II*, 510 Mich at 1105-1106. We explained that the public-policy claim was "factually distinct from [the] WPA claim" because it was not based on Janetsky's report of a violation or suspected violation of law. *Id*. We then ordered the Court of Appeals to consider on remand whether Janetsky's public-policy claim had other legal or factual bases. *Id*. at 1106. However, the Court of Appeals majority framed the relevant inquiry as whether Janetsky had "refus[ed] to violate the law" and concluded that she had not. *Janetsky III*, unpub op at 10-11. The Court of

---

or the ability to retaliate against them in their employment. Because defendants did not raise this issue below, we do not address it further here.

[6] In the first Michigan case explicitly recognizing a public-policy claim nearly 50 years ago, our Court of Appeals stated: "[A]n employer at will is not free to discharge an employee when the reason for the discharge is an intention on the part of the employer to contravene the public policy of this state." *Sventko v Kroger Co*, 69 Mich App 644, 646-647, 649; 245 NW2d 151 (1976) (reversing the trial court's order granting summary judgment for the defendant employer and remanding for further proceedings on the plaintiff's claim that she was discharged in retaliation for filing a lawful claim for workers' compensation). The Court recognized the deleterious nature of allowing an employer to hamper duly established policy through adverse employment actions, which are "the most powerful weapon[s] at the disposal of the employer." *Id*. at 648.

Appeals did not consider, however, that there are other legal bases that may support an employee's claim that their employer violated public policy by terminating their employment.[7]

This Court has previously recognized several bases for a public-policy claim: (1) violation of proscriptions against termination "found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty," (2) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment," and (3) "when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment." *Suchodolski*, 412 Mich at 695-696. We have also observed that "sufficient legislative expression[s] of policy" may "imply a cause of action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges." *Id*. at 695. This list, however, is not exhaustive. See *Rivera v SVRC Indus, Inc (On Remand)*, 338 Mich App 663, 670; 980 NW2d 777 (2021) ("The 'Supreme Court's enumeration of "public policies" that might forbid termination of at-will employees was not phrased as if it was an exhaustive list.' "), quoting *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 573; 753 NW2d 265 (2008).[8]

---

[7] We do not "reject, with very little legal analysis, the Court of Appeals' legal conclusions," as Justice ZAHRA suggests. Rather, we recognize that the Court of Appeals did not analyze whether the "public-policy claim is otherwise legally . . . supported[.]" *Janetsky II*, 510 Mich at 1106. Instead, the Court of Appeals seized on our statement that Janetsky's claim was based on her refusal to violate the law—a conclusion that was not supported by a majority of this Court.

[8] See also *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 525; 854 NW2d 152 (2014).

13

A cause of action may be brought for wrongful termination in violation of public policy if, broadly stated, it would protect employees for "performing an action that public policy would encourage" or "refusing to perform an action that public policy would condemn[.]" Tobias, 1 Litigating Wrongful Discharge Claims (June 2024 update), § 5.1.[9] " 'Public policy' . . . is a legal term of art that refers to policies that are 'clearly rooted in the law.' " *Soaring Pine Capital Real Estate & Debt Fund II, LLC v Park Street Group Realty Servs, LLC*, 511 Mich 89, 101; 999 NW2d 8 (2023), quoting *Terrien v Zwit*, 467 Mich 56, 67; 648 NW2d 602 (2002). It "is *not* merely the equivalent of the personal preferences of a majority of this Court." *Terrien*, 467 Mich at 67. Rather, we look to " 'the policies that . . . have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law.' " *Soaring Pine Capital*, 511 Mich at 102, quoting *Terrien*, 467 Mich at 66-67.

We are mindful that this tort involves a *balancing* of interests out of respect for the reciprocal rights of the employer and employee. See *Prussing v Gen Motors Corp*, 403 Mich 366, 368 n 2; 269 NW2d 181 (1978) (noting the societal need to balance the competing interests in an employment contract for "the best interest of the economic system or the public good") (quotation marks and citation omitted). The Legislature has chosen,

---

[9] See also Restatement Employment Law, Wrongful Discharge in Violation of Public Policy: Protected Activities, § 5.02, pp 208-209 ("An employer is subject to liability in tort under § 5.01 for discharging an employee because the employee, acting in a reasonable manner: . . . (b) performs a public duty or obligation that the employee reasonably and in good faith believes the law imposes [or] . . . (f) engages in other activity directly furthering a well-established public policy."); Dobbs, The Law of Torts (2d ed), § 703, p 776 ("[T]he claim of tortious wrongful discharge is now commonly predicated upon a specific and identifiable public policy that would be undermined if the employer were free to take adverse action against the employee who acts in accord with that policy.").

for related WPA claims, to prohibit retaliation against an employee for reporting either an actual or *suspected* violation of a law. *Janetsky II*, 510 Mich at 1105; MCL 15.362.[10] Some authorities suggest that a similar approach would be sufficient for a common-law public-policy claim. Such an approach finds support in secondary sources. As the Restatement of Employment Law explains:

> Requiring employees to be correct in assessing illegality would unduly chill them from acting in the public interest. Employees usually are not trained in the law and lack access to all the relevant facts. [Restatement Employment Law, § 5.02, comment *g*, p 215.]

These authorities require a "reasonable [and] good-faith belief[]" in the requisite illegality. *Id*.[11] Several of our sister courts have adopted this standard.[12]

---

[10] The United States District Court for the Eastern District of Michigan reasoned similarly in construing what constitutes a "suspected violation" of our WPA:

> The Act's protections are extended beyond the reporting of actual violations by the clause "suspected violations." This is clearly consistent with the purpose of the Act to permit and perhaps encourage employees to report violations of the law without retaliation, which would be thwarted if an employee could only report violations on peril of reprisal if it is ultimately shown that the employer did not violate any laws, rules or regulations. The Act goes on, however, to limit the Act's protection by excluding from its coverage reports that "the employee knows . . . [are] false." Thus the legislature recognized that employees must not be permitted to use the statute in a purely offensive manner by reporting violations known to be false. [*Melchi v Burns Int'l Security Servs, Inc*, 597 F Supp 575, 583 (ED Mich, 1984).]

[11] See also 24 Causes of Action, 2d, Termination of At-Will Employees, § 28, p 304 ("The plaintiff may need to establish that the belief that the defendant or the co-worker was violating the law was reasonable.").

[12] See, e.g., *Green v Ralee Engineering Co*, 19 Cal 4th 66, 87; 960 P2d 1046 (1998) ("Moreover, as the Court of Appeal has held, an employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity.") (citation omitted); *Palmer v Brown*, 242 Kan 893, 900; 752 P2d 685

15

We instead hew closer to prior statements and require a plaintiff claiming retaliation for attempting to prevent or remedy a violation of law to meet three criteria to survive summary disposition. A plaintiff must make a prima facie showing (1) that the law was or would have been violated, (2) that they reasonably and in good faith believed they were remedying or preventing a violation of law, and (3) that their actions regarding the alleged violation were the basis for an adverse employment action. Requiring a plaintiff to show both that the law was or would have been violated and that they acted reasonably and in good faith protects against overreliance on one "employee's subjective understanding of the law" and the resulting negative consequences. See *post* at 6-7.

## 1. PUBLIC POLICY THAT CRIMINAL PROSECUTIONS COMPORT WITH LAW

It is undisputed that Hannahs pled guilty to one count of third-degree criminal sexual conduct in exchange for a recommendation from Boyd that the trial court sentence Hannahs to up to one year in jail and probation. The judge presiding over the Hannahs case had

---

(1988) ("To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare . . . ."); *Schriner v Meginnis Ford Co*, 228 Neb 85, 92; 421 NW2d 755 (1988) ("[A]n action for wrongful discharge lies only when an at-will employee acts in good faith and upon reasonable cause in reporting his employer's suspected violation of the criminal code."); *Phipps v Clark Oil & Refining Corp*, 408 NW2d 569, 571 (Minn, 1987) (applying state statute) ("[W]e hold that an employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law."); cf. *Palmateer v Int'l Harvester Co*, 85 Ill 2d 124, 132-133; 421 NE2d 876 (1981) (recognizing the public policy of Illinois that "[p]ersons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them") (quotation marks and citation omitted).

approved the plea agreement. Janetsky sought the withdrawal of this agreement on the ground that it violated MCL 771.1(1).[13] As noted, her claim is that she was constructively discharged in retaliation for these events, which she alleges were her attempts to prevent or remedy a violation of the statute.

Our Legislature's power to create laws comes from our Constitution, see Const 1963, arts 3 and 4. " 'To declare what shall constitute a crime, and how it shall be punished, is an exercise of the sovereign power of a state, and is inherent in the legislative department of the government.' " *People v Turmon*, 417 Mich 638, 650; 340 NW2d 620 (1983), quoting *People v Hanrahan*, 75 Mich 611, 619; 42 NW 1124 (1889).[14] The state has a paramount interest in ensuring that criminal prosecutions are pursued in compliance with the Legislature's acts.

---

[13] The statute provides:

> In all prosecutions for felonies, misdemeanors, or ordinance violations other than murder, treason, criminal sexual conduct in the first or third degree, armed robbery, or major controlled substance offenses, if the defendant has been found guilty upon verdict or plea and the court determines that the defendant is not likely again to engage in an offensive or criminal course of conduct and that the public good does not require that the defendant suffer the penalty imposed by law, the court may place the defendant on probation under the charge and supervision of a probation officer. [MCL 771.1(1).]

[14] See also *People v Schultz*, 435 Mich 517, 531; 460 NW2d 505 (1990) ("This rule recognizes that the constitutional authority to determine sentencing policies rests exclusively with the Legislature and not the courts."); *People v Auer*, 393 Mich 667, 679; 227 NW2d 528 (1975) ("It is within the legislative power to prescribe, as in this instance, penalties for statutory offenses."); cf. Const 1963, art 4, § 45 ("The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.").

The Legislature enacted MCL 771.1(1) to allow a court to sentence an offender to probation in lieu of a harsher sentence otherwise provided by law. However, the Legislature also set limitations on this power. See MCL 771.1(1). Accordingly, MCL 771.1(1) is a legislative mandate constituting "a formal legislative expression of the state's public policy, which [the Legislature] presumably prefers to see obeyed." *Janetsky II*, 510 Mich at 1108 (CLEMENT, C.J., concurring in part and dissenting in part). See also *Suchodolski*, 412 Mich at 695.

In addition to the Legislature's authority to delineate crime and punishment, Janetsky's claim also implicates the traditional role of the prosecuting attorney to ensure compliance with the law and "that justice shall be done." *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935). While prosecutors have the duty to prosecute those charged with crimes, each prosecutor also "has the responsibility of a minister of justice, not simply that of an advocate." *People v Jones*, 468 Mich 345, 354; 662 NW2d 376 (2003). A prosecutor must ensure procedural justice and utilize only "legitimate means" to obtain a just conviction and sentence. See MRPC 3.8 (staff comment); *Berger*, 295 US at 88 ("It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."). By filling this role at sentencing, the prosecutor preserves the public's confidence in the judicial system and protects the criminal defendant's constitutional right to lawful sentencing. See *In re Chmura*, 461 Mich 517, 542; 608 NW2d 31 (2000) (noting "the state's interest in preserving the integrity of . . . the judiciary"); *People v Francisco*, 474 Mich 82, 90-91; 711 NW2d 44 (2006) ("A defendant is entitled to be sentenced in accord with the law, and is entitled to be sentenced by a judge who is acting in conformity

18

with such law."). Thus, a prosecutor has a paramount interest in ensuring criminal prosecutions are compliant with the Legislature's acts.

Therefore, discharging a prosecutor for seeking to preserve the legal and procedural integrity of a criminal prosecution undermines the Legislature's sovereign power, the role of a prosecutor, and the public's confidence in the criminal justice system.

## 2. DISPOSITION

In this case, Janetsky argues that she was constructively discharged because of her alleged efforts to bring Hannahs's prosecution into compliance with MCL 771.1(1), which permits a trial court to place a defendant on probation for "felonies, misdemeanors, or ordinance violations *other than* murder, treason, *criminal sexual conduct in the first or third degree*, armed robbery, or major controlled substance offenses[.]" (Emphasis added.) Because Hannahs's plea agreement for third-degree criminal sexual conduct included probation, Janetsky claims that it violated the statute.

However, it would be premature for us to decide whether this claim survives summary disposition in the first instance. For example, Justice ZAHRA notes that while MCL 771.1(1) broadly excepts third-degree criminal sexual conduct from its allowance of probation sentences, this is in tension with the provision in MCL 769.34(4)(a) allowing for an "intermediate sanction" as defined by MCL 769.31(b). Yet neither party even identifies—let alone discusses—this question. This is particularly concerning given the implications of this question on criminal sentencing. Likewise, we do not believe that the factual record below is framed in such a way that we could properly consider it under the standard we announce here.

19

We do not have any preconceived notions concerning these outstanding issues. See *post* at 22 n 39. Instead of attempting to resolve this case today, however, we remand for the trial court to determine whether, under MCR 2.116(C)(10), when viewed in the light most favorable to Janetsky, "the proffered evidence fails to establish a genuine issue regarding any material fact[.]" *Heos v East Lansing*, ___ Mich ___, ___; ___ NW3d ___ (February 3, 2025) (Docket No. 165763); slip op at 10 (quotation marks and citation omitted). Accordingly, we vacate Part IV of the judgment of the Court of Appeals and remand for the trial court to consider in the first instance whether this claim survives summary disposition under the test we announce here.[15] On remand, the trial court shall determine if there is a genuine issue of material fact concerning: (1) whether MCL 771.1(1) was or would have been violated, (2) whether Janetsky reasonably and in good faith believed she was remedying or preventing a violation of law, and (3) whether Janetsky's actions regarding the alleged violation were the basis for an adverse employment action.

## C. INTENTIONAL-TORT CLAIMS

Finally, we address Janetsky's intentional-tort claims of false imprisonment and assault and battery. We conclude that the record contains sufficient genuine issues of material fact to preclude summary disposition as to each of these claims.

---

[15] Moreover, we decline the invitation to join Justice ZAHRA on his fact-finding expedition, despite the compelling picture he paints with his observations. See, e.g., *post* at 25 n 48 (concluding that "Boyd more properly evaluated the case"); *post* at 26 ("Plaintiff overreacted to the news that Hannahs had entered a plea with a sentencing recommendation that departed downward from the expected guidelines minimum sentence range."). Even if we were to decide whether Janetsky's case survives summary disposition under MCR 2.116(C)(10), we do not " 'decide . . . questions of fact' " because "appellate courts are not juries." *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992) (citation omitted).

20

## 1. FALSE IMPRISONMENT

" 'False imprisonment is the unlawful restraint of an individual's personal liberty or freedom of locomotion.' " *Stowers v Wolodzko*, 386 Mich 119, 134; 191 NW2d 355 (1971), quoting 35 CJS, False Imprisonment, § 1, p 621. To succeed on a false-imprisonment claim, the plaintiff must show that (1) the defendant "committed [an act] with the intention of confining another," (2) "the act directly or indirectly result[ed] in such confinement," and (3) the plaintiff was "conscious" of the confinement. *Adams v Nat'l Bank of Detroit*, 444 Mich 329, 341; 508 NW2d 464 (1993) (opinion by LEVIN, J.). The parties do not dispute that Boyd acted with an intention to keep Janetsky in his office and that she was, in fact, prevented from leaving the office for some period as a result. The parties dispute, however, (1) whether Janetsky's confinement was long enough to be actionable and (2) whether Boyd had some authority to confine her. We address these issues in turn.

The Court of Appeals held that Janetsky's confinement was not long enough because "at best, Boyd's office door remained closed for 30 seconds before being opened." *Janetsky III*, unpub op at 6. It cited its prior opinion in *Moore v Detroit*, 252 Mich App 384, 387-388; 652 NW2d 688 (2002), to support this point. However, we do not find *Moore* or the authority on which it rests persuasive.

In *Moore*, the plaintiff sued his employer for false imprisonment after he was allegedly confined when he "returned to his former workplace without requesting permission to do so from management . . . at a time of day he knew was inappropriate for employees to be on the premises" to "participate[] in an activity that he knew was against workplace rules." *Id*. at 388. The *Moore* Court concluded that no actionable confinement occurred. *Id*. The panel noted that multiple doors and gates were unlocked (and that "some

21

of [the plaintiff's] co-workers left the premises through these exits") and that the plaintiff presented no evidence that the individual defendant "did anything outside his management authority" by seeking "to limit the ways that [the] plaintiff and the others could leave the premises and thereby to identify" them. *Id*. at 387-388.

The per curiam opinion does not give greater detail as to the scope or length of the alleged confinement. The panel, however, added that any "brief confinement[] or restraint[]" that occurred in that case was of too short a duration to sustain a claim for false imprisonment, *id*. at 388, citing *Willoughby v Lehrbass*, 150 Mich App 319, 350; 388 NW2d 688 (1986), for this proposition. The *Willoughby* Court, however, did not discuss length of detention at all.[16] In sum, *Moore* is inapposite here, and defendants fail to remedy the resulting deficit in authority for their argument.

There is, however, a surplus of authority to the contrary. See, e.g., 35 CJS, False Imprisonment, § 19, p 588 ("False imprisonment does not require that the imprisonment be for a specific duration, and a case of false imprisonment is made out whenever the person complaining is actually restrained without legal authority for an appreciable time, however short.").[17] Numerous other state high courts agree. See, e.g., *MacKenzie v Linehan*, 158

---

[16] The *Willoughby* Court affirmed summary disposition in favor of two school officials, a teacher and a principal, accused of false imprisonment. *Willoughby*, 150 Mich App at 348-350. For the false-imprisonment claim, the Court discussed events that took place in the principal's office and rendered its decision on the basis of (1) the principal's possession of governmental immunity and (2) the plaintiffs' failure to plead or show "any act which resulted in the detention of [the student] in [the principal's] office" by the teacher. *Id*. at 348, 350.

[17] See also, e.g., Dobbs, § 41, p 104 ("Nor need the plaintiff show confinement for a substantial length of time. Unless the defendant is privileged, a confinement for 'any appreciable time, however short' is actionable.") (citation omitted); 32 Am Jur 2d (January 2025 update), False Imprisonment, § 15 ("Any period of unlawful confinement, however

22

NH 476, 482; 969 A2d 385 (2009) (" 'Any period of unlawful confinement, however brief, may result in liability for false imprisonment.' "), quoting 32 Am Jur 2d, False Imprisonment, § 15.[18] As Chief Judge GLEICHER noted in her dissent in this case, only the Second and Third Restatements of Torts mention length of confinement. See *Janetsky III* (GLEICHER, C.J., concurring in part and dissenting in part), unpub op at 5-6. The Second Restatement of Torts introduces limitations on liability for "merely transitory or otherwise harmless confinement," but only where the defendant acts without "intending to confine." Restatement Torts, 2d (October 2024 update), False Imprisonment, § 35. And the Third Restatement of Torts clarifies that "[t]he temporal scope of confinement can be very brief" and that a confinement may exist even if the plaintiff "breaks free in less than a minute." Restatement Torts, 3d (tentative draft No. 3, 2018) (October 2024 update), False Imprisonment: What Constitutes a Confinement, § 8, comment *c*.

We agree with the weight of authority: the length of time one is confined is not dispositive of whether a false imprisonment occurred. Instead, it may be relevant to the

---

brief, may result in liability for false imprisonment. . . . Even if no 'appreciable' length of time elapses, the necessary element of false imprisonment is proven, if enough time elapses for the plaintiff to recognize the illegal restraint.").

[18] See also, e.g., *Marshall v Dist of Columbia*, 391 A2d 1374, 1380 (DC, 1978) ("An unlawful deprivation of freedom of locomotion for any amount of time, by actual force or a threat of force, is sufficient."); *Green v Donroe*, 186 Conn 265, 267; 440 A2d 973 (1982); *Molko v Holy Spirit Ass'n*, 46 Cal 3d 1092, 1123; 762 P2d 46 (1988) ("The tort of false imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.") (quotation marks and citation omitted); *West v King's Dep't Store, Inc*, 321 NC 698, 703; 365 SE2d 621 (1988) ("The tort is complete with even a brief restraint of the plaintiff's freedom."), citing Prosser & Keaton, Torts (5th ed), § 11; cf. *Smith v Wal-Mart Stores East, LP*, 330 Ga App 340, 343; 765 SE2d 518 (2014) (noting the statutory definition of false imprisonment as requiring " 'unlawful detention . . . for any length of time' "), quoting Ga Code Ann 51-7-20.

amount of damages the fact-finder awards. This Court has described the interests served by the false-imprisonment tort in the past:

> As with the torts of defamation and malicious prosecution, the gist of false imprisonment is not physical or mental injury. The gist of an action for false imprisonment is interference with the liberty interest. No showing of physical or mental injury is required. [*Adams*, 444 Mich at 336 (opinion by LEVIN, J.) (discussing the tortfeasor's mistake of identity in effectuating a confinement).[19]]

Academic commentary classifies false imprisonment as among "the dignitary torts," which exist, "at their core, [to] protect a person's dignity." Sugarman & Boucher, *Re-Imagining the Dignitary Torts*, 14 J Tort L 101, 105, 111-112 (2021).[20] "By robbing you of your agency over your physical location, the defendant has interfered with your autonomy and

---

[19] See also 32 Am Jur 2d (January 2025 update), False Imprisonment, § 1 ("The tort of false imprisonment exists to protect and vindicate an individual's interest in freedom from unwarranted interference with that person's personal liberty."). Secondary sources describe the importance of the liberty interest protected by the tort of false imprisonment. See, e.g., 35 CJS, False Imprisonment, § 1, pp 563-564 ("Underlying the legal recourse available for false imprisonment is that no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his or her own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

[20] See also Love, *Actions for Nonphysical Harm: The Relationship between the Tort System & No-Fault Compensation (With an Emphasis on Workers' Compensation)*, 73 Cal L Rev 857, 880 (1985) ("The interest to be protected is primarily a dignitary one in freedom from restraint."); Woodbine, *The Origins of the Action of Trespass*, 34 Yale LJ 343, 369 (1925) ("[I]t would seem that the action of trespass to the person developed from the idea not that damages should be recovered merely for the blows and wounds inflicted on one, but rather for that form of violence which resulted in an affront to the dignity and personal liberty of the one wronged—that is, for false imprisonment.").

thus dignity." *Id*. at 112.[21]  This remains true even where one is confined for a short period of time.

In rejecting Janetsky's false-imprisonment claim, Justice ZAHRA and the Court of Appeals majority fall into the same trap by emphasizing the "brief" duration of the alleged confinement.  As Chief Judge GLEICHER put it in her partial dissent, "By engrafting a nebulous time requirement on the tort, the majority loses sight of the reasons that even a 'brief' false imprisonment can significantly disrupt a person's sense of well-being, warranting a remedy." *Janetsky III* (GLEICHER, C.J., concurring in part and dissenting in part), unpub op at 7-8.  Such a rule introduces an arbitrary and unworkable "is it long enough" standard that sidetracks from the dignitary nature of the tort.  Accordingly, we do not adopt it.

Viewing the evidence in the light most favorable to Janetsky, there is a genuine issue of material fact regarding her confinement and her consciousness of said confinement. Boyd had been screaming at her.  Eventually, Janetsky said, "I'm going to go," and went to the door.  As Janetsky attempted to leave, Boyd "came flying out from behind the desk" and also went to the door.  In Janetsky's telling, Boyd then "[p]ut his hand on the door and blocked my exit."  Janetsky testified that she had been trying to open the door to leave, but Boyd put his hands on the door and continued to yell that she was not allowed to leave.  At that point, Janetsky said she "was fearful that [she] was going to have to fight [her] way out

---

[21] See also Restatement Torts, 2d (October 2024 update), False Imprisonment, § 35, comment *h* ("The mere dignitary interest in feeling free to choose one's own location and, therefore, in freedom from the realization that one's will to choose one's location is subordinated to the will of another is given legal protection . . . against invasion by acts done with the intention [to confine].").

of the room[.]" These facts create a genuine issue of material fact concerning confinement, intent to confine, and consciousness of confinement.[22]

Boyd argues that he possessed authority over Janetsky in his supervisory role to detain her in his office for "[s]upervisory critique." It is true that " '[t]he essence of a claim of false imprisonment is that the imprisonment is false, *i.e.*, without right or authority to do so.' " *Moore*, 252 Mich App at 388, quoting *Hess v Wolverine Lake*, 32 Mich App 601, 604; 189 NW2d 42 (1971). To wit, we also describe it as "unlawful restraint." *Stowers*, 386 Mich at 134 (quotation marks and citation omitted). However, we have long held that it is the defendant's burden to prove lawful authority:

> "As a general proposition, it must be admitted that it is only necessary for the plaintiff, in an action of this kind, to show that he has been imprisoned or restrained of his liberty. The presumption then arises that he was unlawfully imprisoned, and it is for the person who has committed the trespass to show that it was legally justified." [*Donovan v Guy*, 347 Mich 457, 464; 80 NW2d 190 (1956), quoting *Barker v Anderson*, 81 Mich 508, 511; 45 NW 1108 (1890).]

Boyd fails to meet this burden. Boyd claims he has authority as an agent of the employer to physically detain employees for "supervisory critique," citing *Moore*, 252 Mich App 384. However, *Moore* is inapposite on this point for the same reasons outlined earlier regarding duration of confinement. We have found no authority for this proposition. And at least one other court was flummoxed by such a claim. See *MacKenzie*, 158 NH at 483

---

[22] We disagree with Justice ZAHRA's claim that Boyd's eventual compliance with plaintiff's demand for a union representative "undermines any claim of intentional false imprisonment." The fact that a confinement ends does not mean it never occurred or that the individual was not aware of the confinement. Giving dispositive weight to the fact that the defendant later ended the confinement would foreclose virtually all false-imprisonment claims in which the defendant finally frees the subject from their confinement.

("[T]he defendants have not cited, and we are unaware of, any court that has held that the mere fact of employment gives the employer the right to detain an employee in a disciplinary hearing room by physically blocking the door."); see also *Janetsky II*, 510 Mich at 1106 (CLEMENT, C.J., concurring in part and dissenting in part) (observing that "nothing about the nature of the office of an assistant prosecutor gives the officeholder a license to commit intentional torts such as those alleged in this case against coworkers"). Therefore, Janetsky has set forth sufficient facts to create a genuine issue of material fact as to false imprisonment.

### 2. TORT CLAIM OF ASSAULT AND BATTERY

Janetsky's assault and battery claim likewise overcomes defendants' motion for summary disposition. Michigan recognizes that assault may be established (1) when the defendant "attempt[s] to commit a battery" or (2) when the defendant commits "an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005). The defendant must possess at least " 'the apparent present ability' " to accomplish the contact. *Tinkler v Richter*, 295 Mich 396, 401; 295 NW 201 (1940) (affirming a jury instruction on assault), quoting 6 CJS, Assault and Battery, § 1, p 796.[23] As to intent, a plaintiff must show that the defendant had "either an intent to commit a battery or an intent to create in the victim a reasonable fear or

---

[23] See also *Reese v James*, 348 Mich App 454, 463; 19 NW3d 386 (2023) ("[A]ssault 'is defined as any intentional unlawful offer of corporal injury to another person by force, . . . coupled with the apparent present ability to accomplish the contact.' "), quoting *Espinoza v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991); *VanVorous v Burmeister*, 262 Mich App 467, 482-483; 687 NW2d 132 (2004) ("[The] plaintiff must show . . . 'the apparent present ability to accomplish the contact.' "), quoting *Espinoza*, 189 Mich App at 119.

apprehension of an immediate battery." *Mitchell v Daly*, 133 Mich App 414, 427; 350 NW2d 772 (1984). Intent may be proven by circumstantial evidence. See *People v Doud*, 223 Mich 120, 123; 193 NW 884 (1923).[24]

Here, Boyd allegedly struck the door with his hand as Janetsky held the door handle. As Janetsky described it, Boyd's "hand hit the top of the door right above [her] head" as he continued to yell at her. She "could feel . . . the slam—the bang of the door" and "could see . . . Boyd in [her] peripheral vision." Boyd was allegedly so close to Janetsky that she could "feel his [breath]." Moreover, she claims that she "was fearful that [she] was going to have to fight [her] way out of the room" and that she began thinking of ways to do so. Both before and after Boyd slammed the door, he had been aggressively pointing at Janetsky, yelling, and getting increasingly red in the face. The sum total of the record at this juncture alleges that Boyd (1) was physically close to Janetsky, (2) had been angry with her and agitated during the meeting, and (3) moved his hand past her head in an aggressive manner to strike the door.

Plaintiff has set forth specific facts that are sufficient to establish the necessary elements of an assault and that could allow a jury to find the requisite intent. Moreover, Janetsky's concern about having to fight Boyd also creates a question of fact as to her resulting apprehension. Therefore, the Court of Appeals erred by holding that defendants were entitled to summary disposition on this issue.

---

[24] See also, e.g., *Lakin v Rund*, 318 Mich App 127, 131; 896 NW2d 76 (2016) (" 'The intent of the defendant may be established by circumstantial evidence.' "), quoting *People v Terry*, 217 Mich App 660, 663; 553 NW2d 23 (1996).

Lastly, battery is "an intentional, unconsented[,] and harmful or offensive touching of the person of another, or of something closely connected with the person." *Starks*, 473 Mich at 234, quoting *People v Nickens*, 470 Mich 622, 628; 685 NW2d 657 (2004) (quotation marks and citation omitted). Janetsky alleges that Boyd committed a battery when he applied force to his office door to prevent her from leaving. The parties do not dispute that he touched the door or that the touching was intended. Rather, at issue is whether the door was "something closely connected with [Janetsky's] person" such that Boyd's intentional touching constituted a battery. See *Starks*, 473 Mich at 234 (quotation marks and citations omitted).

In describing the appropriate level of connection between the object and the complainant, the Court of Appeals has explained that the object must be " 'attached to [the plaintiff] and practically identified with' the plaintiff's body." *Clarke v K Mart Corp*, 197 Mich App 541, 549; 495 NW2d 820 (1992), quoting *Espinoza v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991) (brackets in *Clarke*). We have not had occasion to address this issue previously, and we have found only two published cases in which our Court of Appeals has done so. In *Espinoza*, a legal malpractice case, the Court of Appeals held that the plaintiff could have established a viable battery claim where striking workers began hitting his vehicle as he tried to enter a parking lot. *Espinoza*, 189 Mich App at 112, 119. The panel explained that the car occupied by the plaintiff was sufficiently connected to his person:

> Protection of the interest in freedom from unintentional and unpermitted contacts with the plaintiff's person extends to any part of his body or to anything which is attached to it and practically identified with it. Thus, if all other requisites of a battery against the plaintiff are satisfied, contact with the

29

car the plaintiff occupies is sufficient to establish a battery. [*Id*. at 119 (citation omitted).]

The Court of Appeals subsequently relied on *Espinoza*'s rule in *Clarke*, holding that an employee's act of snatching a grocery bag out of a store patron's hand would support a claim for battery, but the same employee's act of taking the bag out of the patron's shopping cart would not. *Clarke*, 197 Mich App at 549.

Like false imprisonment, battery is a "dignitary tort." *Re-Imagining the Dignitary Torts*, 14 J Tort L at 109. "[T]he essence of the plaintiff's grievance consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body[.]" Restatement Torts, 2d (October 2024 update), Battery: Offensive Contact, § 18, comment *c*.[25] Accordingly, our courts have recognized battery in cases where, for example, one person pokes the other in the chest during an argument. See *Lakin v Rund*, 318 Mich App 127, 131-132; 896 NW2d 76 (2016).

An object is "closely connected" to one's person only if interference with the object would engender similar offense as touching their person directly. Secondary sources support this requirement, explaining that the object must be an "intimate extension of the . . . person" or "attached to [the person] and practically identified with it." Dobbs, The Law of Torts (2d ed), § 36, p 95; Prosser & Keeton, Torts (5th ed), § 9, p 39; see also 6A CJS, Assault, § 11, pp 145-146. However, "there may be things which are attached to one's body with a connection so slight that they are not so regarded." Restatement Torts, 2d (October 2024 update), Battery: Offensive Contact, § 18, comment *c*.

---

[25] See also Dobbs, § 34, p 83 ("In a world full of uncontrollable events, all persons are at least entitled to prohibit unwanted intentional touchings of any kind.").

Cases from around the country addressing this issue appear to recognize three broad fact patterns in which an object is sufficiently connected to a person to sustain a claim for battery. First, and most numerous, are those in which the object is physically held in the victim's sole possession.[26] Next are those in which the tortfeasor interfered with an article of the victim's clothing.[27] And finally are cases where a vehicle is struck with the victim inside.[28] Prosser & Keeton, Torts, recognizes these three categories and a fourth for objects supporting the victim, such as a person or thing that the victim is leaning on. See Prosser & Keeton, § 9, pp 39-40.

Here, Janetsky claims a battery occurred when she had her hand on the office door handle and Boyd "[p]ut his hand on the door and blocked [her] exit." At her deposition, Janetsky testified that her "hand was on the door when [Boyd's] hand hit the top of the door right above my head" and that she "could feel . . . the slam—the bang of the door." However, the record contains factual discrepancies as to the state of the door at the time

---

[26] See, e.g., *In re BL*, 239 Cal App 4th 1491; 192 Cal Rptr 3d 154 (2015) (the appellant knocked a walkie-talkie out of a teacher's hand); *Picard v Barry Pontiac-Buick, Inc*, 654 A2d 690 (RI, 1995) (the defendant made contact with a camera held in the plaintiff's hand); *Fisher v Carrousel Motor Hotel, Inc*, 424 SW2d 627 (Tex, 1967) (a restaurant employee took a plate from a customer's hand); *Morgan v Loyacomo*, 190 Miss 656; 1 So 2d 510 (1941) (a store manager seized a package from under a customer's arm); see also *State v Ortega*, 113 NM 437; 827 P2d 152 (NM App, 1992) (the defendant grabbed a flashlight out of a police officer's hand).

[27] See, e.g., *Stokes v State*, 233 Ind 10; 115 NE2d 442 (1953) (the victim's tie was burned by gunpowder and his shirt was creased by a bullet from the defendant's gun); *State v Franklin*, 70 Wyo 306; 249 P2d 520 (1952) (the defendant removed glasses from the victim's face).

[28] See, e.g., *Espinoza*, 189 Mich App at 119; see also *State v Townsend*, 124 Idaho 881; 865 P2d 972 (1993) (a husband drove his truck into a vehicle occupied by his wife).

Boyd made contact with it. Janetsky indicates that she "had been trying to open the door" when Boyd made contact with it and that she "never could get the door open."

Thus, there is a genuine dispute of material fact precluding summary disposition. A door is not, in the abstract, equivalent to any of the three general categories of objects that may be attached to a person that are recognized in other jurisdictions. Generally, a closed door is affixed to the building and lacks any sort of identity with a person. Merely touching a door that another is touching could not support a claim for battery. However, Janetsky's allegations, if true, bring the door into the realm of objects held in the victim's sole physical possession. Janetsky was grabbing the door handle, was physically proximate to it, had some level of control over it, alleged that she could feel the vibration in the handle when Boyd slammed the door, and alleged that she may have been in the process of opening the door before Boyd made contact with it. Viewing these facts together, there remains a genuine issue of material fact sufficient to defeat defendants' motion for summary disposition.

## IV. CONCLUSION

The Court of Appeals erred by reversing the trial court's denial of defendants' motion for summary disposition. The plain text of the WPA subjects Saginaw County to suit as Janetsky's employer or co-employer. The economic-reality test is inapplicable because there is no claim or evidence that Janetsky may have been an independent contractor. Further, we set forth the requirements for stating a claim of wrongful termination in violation of public policy based on an action to prevent or remedy a violation of law and we remand to the trial court for application of this rule in the first instance. Finally, the facts

32

here are sufficient to defeat defendants' motion for summary disposition as to the tort claims because (1) the length of time Janetsky was detained is immaterial to liability for false imprisonment and Boyd lacked lawful authority to detain Janetsky, and (2) Janetsky has established genuine issues of material fact regarding her claim of assault and battery. For these reasons, we reverse Parts III(A), III(B), and III(D) of the judgment of the Court of Appeals on remand, vacate Part IV, and remand this case to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

Kimberly A. Thomas
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden

STATE OF MICHIGAN

SUPREME COURT

JENNIFER JANETSKY,

       Plaintiff-Appellant,

v                                    No. 166477

COUNTY OF SAGINAW and
CHRISTOPHER BOYD,

       Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE and JOHN MCCOLGAN,

       Defendants.

_____

JENNIFER JANETSKY,

       Plaintiff-Appellant,

v                                    No. 166478

COUNTY OF SAGINAW, JOHN
MCCOLGAN, and CHRISTOPHER BOYD,

       Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE,

       Defendant.

_____

WELCH, J. (*concurring*).

I join the majority opinion in full but write separately to provide an explanation for my vote as to Part III(B). When this Court first reviewed this case in *Janetsky v Saginaw Co*, 510 Mich 1104 (2022) (*Janetsky II*, for consistency with the majority opinion), I dissented in part from the majority because I believed plaintiff's claim under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., provided an exclusive remedy, and therefore, her public policy claim could not survive. *Janetsky II*, 510 Mich at 1116 (WELCH, J., dissenting in part).

Under the law-of-the-case doctrine, a legal question determined by an appellate court will not be differently determined in a subsequent appeal in the same case where the facts remain materially the same. *Rott v Rott*, 508 Mich 274, 286; 972 NW2d 789 (2021). This doctrine is a "judicially created, self-imposed restraint designed to promote consistency throughout the life of a lawsuit" with a purpose " 'primarily to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." ' " *Id*. at 286-287 (citations omitted). " 'Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals.' " *Id*. at 286, quoting *Grievance Administrator v Lopatin*, 462 Mich 235, 260; 612 NW2d 120 (2000). "Even if the prior decision was erroneous, that alone is insufficient to avoid application of the law of the case doctrine." *Duncan v Michigan*, 300 Mich App 176, 189; 832 NW2d 761 (2013), citing *Bennett v Bennett*, 197 Mich App 497, 500; 496 NW2d 353 (1992). Additionally, this Court has held that the law-of-the-case doctrine applies "only to issues actually decided, either implicitly or explicitly, in the prior appeal." *Grievance Administrator*, 462 Mich at 260.

In *Janetsky II*, the majority explicitly determined that plaintiff's public policy claim was factually distinct from her WPA claim and that those factual allegations did not fall within the scope of the conduct covered by the WPA. *Janetsky II*, 510 Mich at 1105. Therefore, the majority held that the WPA did not provide the exclusive remedy for plaintiff's claim and left the question of whether the public policy claim was legally or factually supported for further consideration on remand. *Id*. at 1105-1106. On remand, the Court of Appeals reversed the trial court and ordered summary disposition of the public policy claim in favor of defendants. *Janetsky v Saginaw Co (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued September 28, 2023 (Docket Nos. 346542 and 346565). The public policy issue is now back before this Court.

While I disagreed with this Court's conclusion that the WPA did not provide plaintiff with an exclusive remedy and that her public policy claim could therefore move forward, I nonetheless recognize that under the law-of-the-case doctrine, that issue is settled for purposes of this appeal. I therefore find it appropriate under the doctrine to look beyond my position in *Janetsky II* and review the question currently before this Court. Accordingly, for the foregoing reasons, even though I would not have reached this issue had my position prevailed in *Janetsky II*, I join the majority's opinion here.

Elizabeth M. Welch

3

STATE OF MICHIGAN

SUPREME COURT


JENNIFER JANETSKY,

             Plaintiff-Appellant,

v                                                          No. 166477

COUNTY OF SAGINAW and
CHRISTOPHER BOYD,

             Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE and JOHN MCCOLGAN,

             Defendants.

_____

JENNIFER JANETSKY,

             Plaintiff-Appellant,

v                                                          No. 166478

COUNTY OF SAGINAW, JOHN
MCCOLGAN, and CHRISTOPHER BOYD,

             Defendants-Appellees,

and

SAGINAW COUNTY PROSECUTOR'S
OFFICE,

             Defendant.

_____

ZAHRA, J. (*concurring in part and dissenting in part*).

This case exemplifies the adage that bad facts make bad law. This is plaintiff Jennifer Janetsky's second appeal in this Court following decisions from the Court of Appeals remanding for entry of summary disposition of all or most of plaintiff's claims.[1] In round one before this Court (*Janetsky II*),[2] a majority of the Court held, in pertinent part, that plaintiff had established a genuine issue of material fact under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*. With regard to plaintiff's claims of intentional torts allegedly perpetrated by defendant Christopher Boyd, the Court's majority concluded that Boyd was not entitled to governmental immunity as a matter of law.[3] Finally, with regard to plaintiff's claims that her constructive discharge was contrary to Michigan public policy, the Court's majority held, in pertinent part, that "[p]laintiff's public-policy claim is factually distinct from her WPA claim and those factual allegations do not fall within the scope of conduct covered by the WPA"; while "[p]laintiff's WPA claim is based on reports to her supervisor of actual or suspected violations of the law in the entering of a plea and sentencing agreement," her "public-policy claim is based on her alleged refusal to violate

---

[1] See *Janetsky v Saginaw Co*, unpublished per curiam opinion of the Court of Appeals, issued April 23, 2020 (Docket Nos. 346542 and 346565) (*Janetsky I*) (remanding for entry of summary disposition in favor of all defendants with respect to all of plaintiff's remaining claims); *Janetsky v Saginaw Co (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued September 28, 2023 (Docket Nos. 346542 and 346565) (*Janetsky III*) (remanding for entry of summary disposition in favor of all defendants on all of plaintiff's remaining claims except her claim of retaliation under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*.).

[2] *Janetsky v Saginaw Co*, 510 Mich 1104 (2022) (*Janetsky II*).

[3] *Janetsky II*, 510 Mich at 1104.

2

the law—i.e., her attempt to set aside that plea and sentencing agreement."[4] Yet the Court's

majority stated, "*We express no opinion as to whether plaintiff's public-policy claim is

otherwise legally or factually supported and leave that issue for further consideration on

remand*."[5]

On remand, the Court of Appeals majority concluded that plaintiff's public-policy

claim was not legally or factually supported.[6] The Court of Appeals also held that plaintiff

---

[4] *Id*. at 1105-1106.

[5] *Id*. at 1106 (emphasis added). This Court's order further directed the Court of Appeals to consider "the issues raised by defendants but not addressed by that court during its initial review." *Id*. at 1104.

[6] The Court of Appeals majority opined that

> plaintiff could not have been asked to violate, nor could she have violated, MCL 771.1(1). MCL 771.1(1) . . . does not, by its plain language, prohibit the prosecution from offering a plea and sentencing agreement involving probation. The Legislature . . . placed the burden on the trial court to avoid violating MCL 771.1 by imposing an invalid sentence of probation. [*Janetsky III*, unpub op at 11 (emphasis omitted).]

The majority also

> conclude[d] that plaintiff's attempt to bring the plea and sentencing agreement into compliance with MCL 771.1(1) does not place it within the limited class of legislative expressions of public policy that have been found to imply a cause of action for wrongful termination. See *Suchodolski*[ *v Mich Consol Gas Co*, 412 Mich 692, 694-695; 316 NW2d 710 (1982)] (noting that courts have "*occasionally* found sufficient legislative expression of policy to imply a cause of action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges") (emphasis added). [*Janetsky III*, unpub op at 11.]

3

failed to present sufficient evidence to sustain her claims of false imprisonment[7] and assault

and battery.[8]  With regard to the WPA claim, the Court of Appeals applied the economic-

---

[7] With regard to false imprisonment, the Court of Appeals majority held:

> Plaintiff's false-imprisonment claim was premised on plaintiff's allegation that, at a meeting held in Boyd's office in 2015, Boyd briefly held the door to block her from leaving his office.  Plaintiff testified at her deposition, however, that she did not try to open the door after Boyd closed it.  Further, she testified that when she yelled back at Boyd and demanded a union representative, Boyd opened the door and yelled for the union's vice president to come to the meeting.  She estimated that the confrontation at the door lasted "thirty seconds or less."  Plaintiff's own testimony indicates that, although she initially stated that she was going to leave, after [a] brief argument and obtaining the presence of a union representative, she sat down and continued the discussion.  Plaintiff therefore did not establish that she was actually confined or conscious of any confinement; at best, Boyd's office door remained closed for 30 seconds before being opened.  *Moore* [*v Detroit*, 252 Mich App 384, 388; 652 NW2d 688 (2002)]  (noting that the plaintiff's confinement or restraint caused by the defendant's conduct was "momentary and fleeting.").  [*Janetsky III*, unpub op at 5-6.]

[8] With regard to the assault and battery claim, the Court of Appeals majority held:

> We conclude that plaintiff did not establish a genuine issue of material fact and that the trial court therefore erred by denying defendants' motion for summary disposition regarding plaintiff's claim for assault and battery.

> * * *

> [P]laintiff did not allege that Boyd actually touched her, but argued that her claim for battery was supported by her and Boyd's struggle over the door to his office. The record does not support plaintiff's argument—in fact, plaintiff testified at her deposition that she didn't continue to touch the door handle or attempt to open the door after Boyd closed it.  Further, plaintiff has not supported her argument that a door may become "attached to" and "practically identified with" the body of a person trying to open it. *Clarke*[*v K Mart Corp*, 197 Mich App 541, 549; 495 NW2d 820 (1992)] (citation

4

reality test to conclude that Saginaw County was not plaintiff's employer.[9]

Plaintiff again sought leave to appeal in this Court, and the Court's majority again decided to intervene by granting oral argument on the application and asking the parties to file supplemental briefs addressing

> (1) whether the Court of Appeals properly determined that Saginaw County was not the plaintiff's employer for purposes of her [WPA] claim; (2) whether the plaintiff's alleged efforts to bring a criminal prosecution into compliance with MCL 771.1 gave rise to a common-law claim for termination in violation of public policy as recognized by *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 694-695[; 316 NW2d 710] (1982); and (3) whether the plaintiff established the existence of a genuine issue of material fact regarding her intentional tort claims of false imprisonment and assault and battery.[10]

---

> omitted). The trial court acknowledged that plaintiff had not alleged an actual touching, yet held that there was a genuine issue of material fact regarding plaintiff's assault and battery claim based on the "allegation that [plaintiff] was holding onto the door and it was allegedly closed by Mr. Boyd and when you look at . . . the evidence presented at this point I find that there is a genuine issue as to material fact regarding that claim." To the extent the trial court's statement indicates that it found a genuine issue of material fact regarding whether a civil battery had occurred, it erred by doing so.
>
> Further, plaintiff's allegations and testimony do not establish a genuine issue of material fact regarding whether Boyd's conduct constituted civil assault. Plaintiff did not testify that Boyd intentionally threatened to do her injury, and we conclude that the force Boyd applied to his own office door was not "force unlawfully directed toward" plaintiff's person. *Espinoza* [*v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991)]. Plaintiff described a heated confrontation and less-than-civil behavior on the part of Boyd, but, viewed in the light most favorable to her, Boyd's behavior falls short of assault as a matter of law. [*Janetsky III*, unpub op at 6-7.]

[9] *Id*. at 8-9.

[10] *Janetsky v Saginaw Co*, 513 Mich 1052, 1052 (2024).

5

In round two of this Court's review of this matter, a majority of this Court again reverses the Court of Appeals on all of these issues. I concur in the holding that the Court of Appeals erred by using the economic-reality test to determine whether Saginaw County is plaintiff's employer under the WPA. The term "employer" is statutorily defined broadly in the WPA. Saginaw County plainly fits within that definition. On the other hand, I strongly disagree with the majority's decision to reverse the Court of Appeals' holding that plaintiff's claim of constructive discharge in violation of public policy is devoid of factual and legal support. I accept that plaintiff can allege a public-policy claim that is factually distinct from her WPA claim.[11] But I cannot accept the majority's decision to reject, with very little legal analysis, the Court of Appeals' legal conclusions, thereby expanding

---

[11] I agree in part with Justice WELCH's concurrence, which adequately explains why I too am bound by this Court's previous decision in this case. But merely recognizing that a public-policy claim can exist independent of the WPA does not bar me or this Court from looking at the record evidence to determine whether plaintiff has adequately alleged facts that, if true, would sustain such a claim. After all, this case already has a long and tortured appellate history. The Court once previously remanded this matter to the Court of Appeals for further proceedings consistent with this Court's last proclamation. Accordingly, I disagree with my colleagues that this Court should again remand this matter to the lower courts to determine whether plaintiff can present a prima facie case of constructive discharge in violation of Michigan's public policy. I have painstakingly reviewed the record and conclude that the undisputed facts presented in this case cannot legally sustain a claim of wrongful termination in violation of Michigan public policy. Simply because a public-policy claim can theoretically exist independent of the WPA does not mean that the majority's newly found basis for a public-policy claim is legally or factually supported. The majority opinion, in rote fashion, declares that the trial court would be better suited to determine whether MCL 771.1(1) was or would have been violated. But whether this statute was or could have been violated is a question of law. This Court is the final arbiter of Michigan law. We can and should decide this legal question without further delay. I have explained with great specificity and detail that plaintiff's public-policy claim is not only inconsistent with Michigan public policy, but it is also unsupported by the uncontroverted facts presented in this case.

6

common-law public-policy employment claims to include alleged workplace retaliation arising from an employee's efforts to ensure that the employer complied with the employee's subjective understanding of the law. I also dissent from the conclusion that plaintiff has presented sufficient facts to sustain her common-law claims of false imprisonment and assault and battery. I would affirm the Court of Appeals' dismissal of the public-policy claim and the intentional-tort claims, and I would reverse only the holding that Saginaw County is not plaintiff's employer under the WPA.

## I.  PERTINENT FACTS & PROCEDURE AND FACTS NOT INCLUDED IN THE MAJORITY OPINION

In January 2011, plaintiff commenced her employment as an assistant prosecuting attorney I (APA I) in the Saginaw County Prosecutor's Office. She was appointed to her position by Michael Thomas, who was then the elected Prosecutor in Saginaw County. She was later promoted to APA II, where she for all intents and purposes exclusively prosecuted criminal sexual conduct cases.

Defendant John McColgan was elected Saginaw County Prosecutor in November 2012 and took office on January 1, 2013. McColgan reappointed plaintiff to her APA II position and appointed Chrisopher Boyd the Chief Assistant Prosecutor. As the Chief Assistant, Boyd managed the day-to-day affairs of the Prosecutor's Office. Plaintiff acknowledged that every decision in the office went through Boyd. Boyd met regularly with plaintiff, as he did with every APA in the office. Every case was discussed in detail, including the strengths and weaknesses of every file.

The case that gave rise to this litigation stemmed from allegations of criminal sexual conduct by a teenage complainant. The perpetrator was alleged to be Justin Hannahs. The

7

crime was not reported until two years after its alleged occurrence, and there were inconsistencies in the complainant's statements. Nonetheless, plaintiff felt confident in her case because the investigating Michigan State Trooper who was assigned to the case had elicited a confession from Hannahs. Plaintiff's first task in the underlying investigation was to issue warrants to seize computers belonging to the complainant and Hannahs. Plaintiff did not interview the complainant's sister, even though she was alleged to have been present during the wrongful conduct. Plaintiff also did not seek a forensic examination of the computers that she confiscated.

Hannahs was arrested and arraigned on October 23, 2013, and he posted a $35,000 bond. Shortly after his release on bond, the complainant claimed that Hannahs had sent emails to her friend that threatened the complainant.[12] Plaintiff immediately moved to cancel Hannahs's bond. The bond was canceled on October 29, 2013, and Hannahs was held in the Saginaw County jail.[13]

---

[12] The email reportedly stated, "I may have no contact with you, so I'll go through (your) friends to get (you). I'm coming for you and I will kill you after having fun first. Tell your man that he can't stop me. No one can, since no one knows (except) your friend and now you, and I am not directly speaking to you. See you soon (expletive)." Hoag, *Midland Man to Get Jail, Probation for Sexually Assaulting Teen Relative*, The Saginaw News Online (June 10, 2014) <https://www.mlive.com/news/saginaw/2014/06/midland_man_to_get_jail_probat.html> (accessed May 21, 2025) [https://perma.cc/KPB7-X6R6].

[13] According to plaintiff's deposition testimony, Hannahs was incarcerated for at least 18 months. The register of actions for Hannahs's case reflects that his bond was reinstated on May 4, 2015, which was 18 months and 5 days after his bond was canceled.

In December 2013, plaintiff obtained information from Google regarding the alleged threatening emails. Plaintiff did not review this data, opting instead to turn it over to defense counsel, William White.

Not satisfied with the representation of William White, Hannahs hired a former prosecutor, Mark Van Benschoten, to take up his defense. Van Benschoten made a case to plaintiff for a reduced plea, but plaintiff held firm, offering no deal other than a straight-up plea to one count of first-degree criminal sexual conduct (CSC-I), a life offense. Plaintiff, however, informed Van Benschoten that he could seek a better deal from Boyd or McColgan. Van Benschoten took plaintiff up on her offer and asked Boyd to review his client's case. Still, Boyd held firm in support of plaintiff's position.

Van Benschoten thoroughly reviewed the file of his client and discovered that the Google data showed a high degree of likelihood that the complainant herself sent the threatening email that resulted in Hannahs's bond being canceled. He also learned that the Prosecutor's Office had not yet interviewed the complainant's sister, who Van Benschoten had reason to believe "had exculpatory information" that contradicted the complainant's allegations. Hannahs added an additional member to his defense team, attorney George Bush. Bush and Van Benschoten met with Boyd to discuss their findings, and Boyd became concerned. Although plaintiff continued to believe that the confession was sufficient to make the case, Boyd concluded that her evaluation was unrealistic. Boyd was also concerned that the complainant's sister was never interviewed and was not listed as a res gestae witness.

Hannahs moved for a remand to the district court for a preliminary examination. The motion was to be heard on June 2, 2014, while plaintiff was on her honeymoon. Boyd

9

agreed to cover the preliminary examination hearing. It was at this scheduled hearing that Boyd offered a plea deal that Hannahs and the trial court accepted. The agreement required Hannahs to plead guilty to one count of third-degree criminal sexual conduct (CSC-III) in exchange for the dismissal of the remaining counts and a sentencing recommendation from the prosecutor. The estimated sentencing guidelines placed the minimum sentence range at 19 to 35 months. The plea offer included a recommendation from the prosecution for a downward departure of five years' probation, with the first 12 months to be served in the county jail. Hannahs would also have been required to register as a sex offender with the Michigan Sex Offender Registry. Pursuant to the offer, Hannahs, who had already been incarcerated for more than seven months, would receive credit for time served.

Upon returning to work, plaintiff objected to the plea and complained directly to McColgan. Plaintiff asserted that the plea deal was illegal because the complainant was not informed of the offer before the plea was entered, allegedly in contravention of the Crime Victim's Rights Act (CVRA).[14] Plaintiff also argued that the sentencing recommendation was in violation of MCL 771.1(1), which, according to plaintiff, requires incarceration in a state prison, not a county jail. McColgan, without hesitation, investigation, or consultation with Boyd, advised plaintiff to take whatever action she

_____

[14] MCL 780.751 *et seq*. It does not appear that there was a violation of the CVRA. As the Court of Appeals majority concluded on remand, "the record shows that, despite plaintiff's concern that the victims had not been kept up to date, [plaintiff] was able to meet with the victims, provide new information, and receive additional feedback upon her return to the office. Because this took place before plaintiff's attempt to set aside the plea and sentencing agreement at issue, it appears that plaintiff's attempts to [set aside the plea] were based on her belief that the sentence violated MCL 771.1(1), not based on any violation of the CVRA." *Janetsky III*, unpub op at 10-11.

10

deemed necessary to alleviate her concerns. Plaintiff drafted a motion to set aside the sentencing recommendation and to allow Hannahs the opportunity to withdraw the plea. Boyd never admitted or believed that the plea and sentencing recommendation were illegal or contrary to law.[15] Nonetheless, Boyd signed the motion, which was granted. Hannahs withdrew the plea.

At Hannahs's preliminary examination, the complainant testified regarding her CSC allegations as well as her knowledge of the threatening emails. The complainant swore under oath that she had nothing to do with the threatening emails, which she claimed originated from Hannahs.

Hannahs's defense counsel demanded a forensic examination of the complainant's computer. However, plaintiff did not voluntarily agree to an examination. Instead, defense counsel obtained an order from the trial court allowing a defense expert to review the computers. Based on the findings of the expert, Hannahs's defense team concluded that the complainant had perjured herself regarding the threatening emails. Specifically, the expert concluded that the alleged threatening emails were created and sent by the complainant. Only after being confronted with this evidence did plaintiff seek forensic review of the data from Google and the computers she had seized roughly a year earlier. The Michigan State Police confirmed the findings of the defense expert. For more than a year, plaintiff sat on evidence that, upon review, turned out to be exculpatory to the defense.

---

[15] Boyd admitted that under MCL 771.1, "a straight probationary term is not appropriate, and not allowed." But Boyd never offered Hannahs a straight probationary term. Hannahs was to serve "a year in the Saginaw County Jail" before being released on probation for four additional years.

Additional evidence came to light that cast doubt on the complainant's description of the alleged CSC. In the spring of 2015, plaintiff agreed with Boyd to dismiss the email-related charges; i.e., the charges that resulted in the cancelation of Hannahs's bond and his incarceration in the county jail for approximately 18 months. Plaintiff offered Hannahs a plea to gross indecency, which he rejected. Plaintiff was eventually removed from the case and instructed to have no contact with the complainant. All charges were eventually dropped against Hannahs by *nolle prosequi* on June 8, 2015.

Shortly before entry of the *nolle prosequi* dismissal order, plaintiff confided in APA Pat Duggan, who was her union representative, that she feared she was about to be fired.[16] On June 4, 2015, plaintiff tendered a letter to McColgan, claiming that she had been the victim of retaliation by Boyd ever since plaintiff had objected to the Hannahs plea deal that was ultimately withdrawn. The letter also highlighted events of June 1, 2015—the day of the exchange in Boyd's office, which are fairly and accurately described in the majority opinion. According to plaintiff's complaint, she left work because of work-related stress on June 4, 2015. The following day, McColgan placed plaintiff on paid administrative leave.

Still, a perjury charge remained to be prosecuted against the complainant in Hannahs's case. While on administrative leave, plaintiff apparently ignored the directive

---

[16] On June 3, 2015, plaintiff attended a meeting with Boyd and Hannahs's mother about a potential perjury prosecution of the complainant. During that meeting, Hannahs's mother claimed that plaintiff had previously told her that the perjury allegation had been referred to the Attorney General. However, the case had not been referred to the Attorney General. Plaintiff denied making this misrepresentation and declared that it was a misunderstanding. Plaintiff expressed to Duggan that she feared this miscommunication could result in her termination.

from her employer to have no communication with the complainant. Plaintiff went so far as to continue her communications with the complainant even after the complainant had been charged with perjury and was represented by defense counsel.

On October 9, 2015, Boyd and his Deputy Chief Assistant, Mark Gaertner, met with the complainant and her mother, both of whom claimed that plaintiff had pressured the complainant to commit perjury at the preliminary examination. They asserted that plaintiff had continued to communicate with the complainant even after the CSC case was dismissed and that plaintiff told the complainant the CSC case ended as it did because the Hannahs family paid off Boyd. The complainant had no evidence of plaintiff's alleged communications, claiming that plaintiff informed her to delete all text messages from plaintiff after the complainant read them. But shortly after the meeting ended, the complainant and her mother returned to the Prosecutor's Office to show Boyd and Gaertner a text the complainant had just received from plaintiff. The text read, "I need to reach out to you."

Boyd and Gaertner became concerned that plaintiff may have suborned perjury or the destruction of evidence. The matter was turned over to the Department of Attorney General for independent investigation. The case was assigned to former Wayne County assistant prosecutor and former judge Richard Cunningham, a highly respected member of the Michigan Bar, who concluded that Gaertner "may have to consider reporting [the matter] to the Attorney Grievance Commission."[17]

---

[17] Plaintiff alleges that the referrals to the Attorney General, the Michigan State Police, and the Attorney Grievance Commission are further evidence of retaliation against her. Defendants respond that they were duty-bound to make these referrals given the facts that

Plaintiff filed the instant suit on November 19, 2015. On December 14, 2015, plaintiff sent a letter to McColgan announcing her involuntary resignation, claiming that she was constructively discharged from her employment because it was impossible for her to work with Boyd in the office.

## II. PUBLIC-POLICY CLAIM

As previously stated, in *Janetsky II*, the Court simply declared that a public-policy claim can exist independent of a claim under the WPA if facts independent of the WPA claim support the public-policy claim pursuant to *Suchodolski*. But the Court "express[ed] no opinion as to whether plaintiff's public-policy claim is otherwise legally or factually supported and [left] that issue for further consideration on remand [to the Court of Appeals]."[18] Beyond "proscriptions [against termination] found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty," this Court has recognized a public-policy claim for retaliatory discharge: (1) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment" and (2) "when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment."[19]

---

were revealed to them. The grievance cited Michigan Rule of Professional Conduct 4.2., concerning "Communication With a Person Represented by Counsel."

[18] *Janetsky II*, 510 Mich at 1106.

[19] *Suchodolski*, 412 Mich at 695-696.

14

On remand, the Court of Appeals found no legal merit to plaintiff's claims, including her claim that the plea and sentencing recommendation in the Hannahs case was improper under the law. Specifically, the Court concluded that plaintiff "could not have been asked to violate, nor could she have violated, MCL 771.1(1)."[20]

The majority opinion reverses this legal finding without substantive critique of the Court of Appeals' legal analysis or an independent legal analysis of the statutory provisions at issue in this case.[21] The majority opinion does not conclude that plaintiff has established a public-policy claim under the narrow bases that exist under our current caselaw. Rather, the majority opinion simply claims that these bases are not exhaustive and cobbles together a new basis to establish a public-policy claim that may inure to the benefit of plaintiff. The majority opinion provides no explanation for why this new basis is required to address

---

[20] *Janetsky III*, unpub op at 11.

[21] The majority opinion implies that the Court of Appeals erred when it "framed the relevant inquiry as whether [plaintiff] had '[refused] to violate the law' and concluded that she had not." I am hard-pressed to find any error in the framing of this issue by the Court of Appeals when this Court's remand order itself states that "plaintiff's public-policy claim is based on her alleged refusal to violate the law—i.e., her attempt to set aside [the] plea and sentencing agreement." *Janetsky II*, 510 Mich at 1104. The majority opinion implies that the Court of Appeals missed the critical question on remand by failing to "analyze whether [plaintiff's] 'public-policy claim is otherwise legally . . . supported[.]' " However, the Court of Appeals expressly concluded that it was not. The Court of Appeals summed up its responsibilities on remand as follows: "Our Supreme Court instructed this Court on remand to 'assess whether plaintiff's public-policy claim is legally and factually supported.' We now do so, and conclude that it is not[.]" *Janetsky III*, unpub op at 10 (citation omitted). The majority opinion denies my assertion that the Court "reject[s], with very little legal analysis, the Court of Appeals' legal conclusions," yet the majority fails to point to its analysis finding error in the opinion of the Court of Appeals. I therefore leave it to the reader to assess the quality of any analysis in the majority opinion explaining why the Court of Appeals erred.

15

employer conduct that is "so contrary to public policy as to be actionable"[22] and offers no substantive analysis that such a basis is "clearly rooted in the law."[23]

The majority opinion offers "secondary sources" to support the new test it "announce[s]." Specifically, the majority opinion relies on the Restatement of Employment Law, a treatise that reports the musings of law professors and lawyers from across the country.[24] The Restatement is a publication that has no expertise in or concern regarding what Michigan's public policy is or should be. And the majority opinion does not rely on the actual text of a provision of the Restatement. Rather, the majority quotes a comment on the text of a subsection of the Restatement. This hardly meets the rigid standard from *Terrien*, which is properly cited in the majority opinion as the authority on how to determine the public policies of Michigan. And even more confounding is the fact that the comment in the Restatement of Employment Law cited by the majority claims only that "[r]equiring employees to be correct in assessing illegality would unduly chill them

---

[22] *Suchodolski*, 412 Mich at 695.

[23] *Terrien v Zwit*, 467 Mich 56, 67; 648 NW2d 602 (2002).

[24] I have previously cautioned against overreliance on a Restatement because it is the responsibility of this Court, not the American Law Institute, to develop the common law of this state. See *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 159; 1 NW3d 44 (2023) (ZAHRA, J., dissenting) ("[W]e, the justices of the Michigan Supreme Court, decide the future of Michigan common law, not the group of law professors enlisted by the American Law Institute, most of whom have no ties to Michigan and are unaccountable to the people of Michigan. Indeed, we must never forget that it is the constitutional duty and obligation of this Court to determine the common law of this state. And we are charged with effectuating the public-policy choices and social mores of Michiganders when we expound on our common law.").

16

from acting in the public interest."[25] The comment continues, "Employees usually are not trained in the law and lack access to all the relevant facts."[26] But nothing could be further from the truth in this case. Plaintiff is trained in the law. Plaintiff was expected to use her legal training and expertise to accurately assess whether defendants' actions involved any illegality. Thus, it is difficult to understand how this newly created public-policy claim has any application to the undisputed facts presented in this case.

Be that as it may, the majority opinion simply declares that a claim of wrongful termination in violation of public policy now exists when a plaintiff makes "a prima facie showing (1) that the law was or would have been violated, (2) that [the plaintiff] reasonably and in good faith believed they were remedying or preventing a violation of law, and (3) that [the plaintiff's] actions regarding the alleged violation were the basis for an adverse employment action."[27]

In an effort to meet the rigid standard articulated in *Terrien*, the majority opinion declares that it is Michigan's public policy that criminal prosecutions comport with the law. True enough. But what evidence has been presented that the Hannahs plea deal did not comport with the law? The majority opinion describes at length the prosecuting attorney's aspirational obligations to see " 'that justice shall be done' " and describes the prosecutor as holding " 'the responsibility of a minister of justice, not simply that of an advocate.' " The majority opinion proclaims that prosecutors should "utilize only

---

[25] Restatement Employment Law, § 5.02, comment *g*, p 215.

[26] *Id*.

[27] *Ante* at 16.

'legitimate means' to obtain a just conviction and sentence[,] . . . [thereby] preserv[ing] the public's confidence in the judicial system and protect[ing] the criminal defendant's constitutional right to lawful sentencing." The majority opinion additionally declares that " '[a] defendant is entitled to be sentenced in accord with the law, and is entitled to be sentenced by a judge who is acting in conformity with such law.' "

The majority opinion's reliance on these many aspirational platitudes concerning the duties of prosecutors is misplaced, and it fails to consider and does not detract from the reality that

> [e]very day in courtrooms across Michigan prosecutors choose to dismiss or reduce charges, implement diversion programs, or otherwise enter into sentencing agreements that reduce the sentencing exposure of a person accused of a crime. Every plea bargain, to varying degrees, allows the "parties and the trial court to disregard the penalties prescribed by the Legislature for a particular crime."[28]

Our court rules reflect this understanding and allow for the prosecution to enter into a plea with a sentencing recommendation and leave to the trial court whether to accept or reject the plea or follow the recommended sentence.[29] Indeed, the court rules even allow the prosecution to enter into a plea deal that permits a defendant to plead to an offense the defendant did not commit so long as the defendant provides a sufficient basis to plead

---

[28] Proposed Amendments of MCR 6.302 and MCR 6.610 (ADM File No. 2018-29), Comment from the State Appellate Defender Office (July 9, 2021), p 4, available at <https://www.courts.michigan.gov/4a569c/contentassets/0bfa5a1e17f441c59ed928da0b1f0047/approved/2018-29_2021-07-09_commentfromsado.pdf> (accessed June 13, 2025) [https://perma.cc/G29C-669Z]. Nearly all the comments from interested stakeholders expressed this same view in opposing this proposal.

[29] See MCR 6.302(A) through (E).

guilty to the charged offense, i.e., a so-called "fictional" or "equitable" plea.[30] Given these rules, it is apparent that Michigan public policy favors equitable pleas. As noted by the State Appellate Defender Office, "[t]he public is aware that this is how our current system operates. Allowing for equitable pleas is one small way that the parties can create a more individualized solution to a particular person's situation."[31]

This Court has recognized the power of the prosecutor to determine what charges to bring against an accused, understanding that this decision sets the stage for the eventual sentence.[32] Prosecutors also have the discretion to extend an offer to plead to a lesser charge. It is well settled that this authority does not violate separation-of-powers principles.[33] And the prosecutor has the authority to agree with a defendant "for a sentence for a specified term or within a specified range[.]"[34] If the "court states that it is unable to follow the agreement[,] the trial court shall then state the sentence it intends to impose, and provide the defendant the opportunity to affirm or withdraw the plea[.]"[35] During the plea bargaining process, "[p]ublic confidence in a system increasingly driven by negotiation can only be preserved by protecting the defendant's constitutional rights, upholding the

---

[30] See e.g., *People v Lafay*, 182 Mich App 528, 532; 452 NW2d 852 (1990); *People v Henderson*, ___ Mich ___, ___; 11 NW3d 800, 801 (2024) (CLEMENT, C.J., dissenting).

[31] Proposed Amendments of MCR 6.302 and MCR 6.610 (ADM File No. 2018-29), Comment from the State Appellate Defender Office (July 9, 2021), p 2.

[32] See *People v McGraw*, 484 Mich 120, 130; 771 NW2d 655 (2009).

[33] See generally *Lafler v Cooper*, 566 US 156, 168; 132 S Ct 1376; 182 L Ed 2d 398 (2012).

[34] MCR 6.310(B)(2)(a).

[35] *Id*.

19

prosecutor's executive authority, and preserving the trial court's independence. The optimum bargained disposition is that result which best harmonizes these core interests."[36] The first two of these "core interests" were protected in the plea deal reached in Hannahs's case, and the trial court was fully aware that the prosecutor was recommending that Hannahs be given a downward departure from the guidelines minimum sentence range. I see no basis to believe that Boyd's sentencing recommendation was inconsistent with Michigan public policy. To the contrary, I question whether public policy favors a prosecuting attorney's claim that a supervising attorney's sentencing recommendation was unlawful when the county prosecutor has discretion (and, in this case, ultimately exercised that discretion) to dismiss the charges altogether.

Michigan public policy currently favors disposition by plea bargain and increasingly favored such resolutions "[f]rom 2017 to 2023, [during which time Michigan] circuit courts disposed of an average of 38,332 cases per year as the result of a verdict or plea, with an average of only 1,152 cases (2.92%) being decided by a jury or bench verdict. The actual percentage is even lower if you include thousands of felony pleas that are accepted in district courts or municipal courts each year."[37] And our court rules expressly allow for

---

[36] *People v Siebert*, 450 Mich 500, 518-519; 537 NW2d 891 (1995).

[37] Proposed Amendments of MCR 6.610 (ADM File No. 2018-29), ___ Mich ___ (December 19, 2024) (declining to adopt any proposed amendments to MCR 6.302 and MCR 6.610), available at <https://www.courts.michigan.gov/siteassets/rules-instructions-administrative-orders/proposed-and-recently-adopted-orders-on-admin-matters/adopted-orders/2018-29_2024-12-19_formor_declinetoadopt.pdf> (accessed May 29, 2025) [https://perma.cc/DGK8-B4EX]; *id*. at ___ n 21 (VIVIANO, J., dissenting); slip order at 5 n 21.

20

"equitable" plea deals and place the burden on the trial court to question their legality. If the court makes an error, the parties may seek leave to appeal.

The majority opinion does not address these countervailing public-policy concerns and instead contends that public policy simply favors an employee's efforts to achieve compliance with that employee's understanding of the law. This is an incredibly nebulous notion that may result in a "chilling effect" on employers, discouraging them from engaging in lawful activities for fear that their employees may disagree with the lawfulness of their actions. This is particularly true when the employee is an attorney. As noted by Justice WELCH during oral arguments, "It's literally our job as lawyers to interpret the law and advocate for a position, and we sometimes might internally disagree about that." In other words, this case is no different from "a corporate management dispute and lacks the kind of violation of a clearly mandated public policy that would support an action for retaliatory discharge."[38] In this context, how is a court to draw a line as to what is acceptable advocacy in favor of a particular interpretation of the law and what is unacceptable advocacy, in violation of public policy?

Setting aside the debate of what exactly constitutes Michigan's public policy as it relates to the exercise of discretion by county prosecutors and accepting the majority's newly declared basis for wrongful termination in violation of public policy, I nonetheless disagree that this Court ought not decide whether there exists record evidence to support the first two prongs of the newly created public-policy claim described in the majority

---

[38] *Suchodolski*, 412 Mich at 696.

21

opinion.[39]  As for the first prong, plaintiff must present proof that the law was or would

have been violated.  As mentioned, the Court of Appeals held that "*plaintiff* could not have

been asked to violate, nor could she have violated, MCL 771.1(1)," because the statute

does not prohibit a prosecutor from offering a plea and sentencing agreement involving

[39] The majority opinion accuses me of going on a "fact-finding expedition."  Not so.  It is not fact-finding when the facts are undisputed.  That Boyd properly concluded the case should be resolved by plea agreement is undisputed fact.  Plaintiff had her way and the plea to which she so strenuously objected was withdrawn.  How did the case resolve?  Is Hannahs in prison following a CSC-I conviction?  No.  Hannahs was never tried for the crime of CSC-I because the prosecution could not make a case against him.  It is therefore undisputed that Boyd correctly evaluated the case as one that should be resolved via plea agreement.  The majority opinion cites no facts to put this evaluation in question.  Likewise, it is undisputed that plaintiff reflexively declared that the plea deal Boyd offered to Hannahs violated MCL 771.1(1) and the CVRA without sufficient legal analysis.  Accordingly, the undisputed facts support the conclusion that plaintiff overreacted to the plea offered by Boyd and accepted by Hannahs and the trial court.  Although not mentioned in the majority opinion, it is also undisputed that plaintiff failed to interview the complainant's sister, failed to list the complainant's sister as a res gestae witness, failed to timely review and analyze the Google data she subpoenaed, and failed to timely conduct a forensic examination of the computers she seized early in the investigation.  The majority opinion properly notes that our role is to determine whether the proffered evidence creates a genuine issue of material fact.  But after four appeals and two trips to this Court, the majority opinion is unable to identify any specific genuine and material factual disputes that need to be resolved by a jury.  A majority of this Court simply wants plaintiff to present her story to a jury.  But for the reasons I have stated, there is no legal reason for this case to be presented to a jury.  Nonetheless, my arguments are unrebutted and ignored.  To paraphrase Jonathan Swift, the popular Irish satirist of the eighteenth century, I cannot reason this Court out of a position it did not reason itself into in the first place.  The Court of Appeals did exactly what this Court asked of it and ultimately concluded that plaintiff failed to present evidence sufficient to sustain a public-policy claim as recognized by *Suchodolski*.  But the result reached by the Court of Appeals is simply not the result that this Court's majority desires.  So, the Court "announce[s]" a new test for the lower courts to apply.  Why the Court did not announce this new test when this case was last before this Court is a mystery.  I suspect the lower courts will once again determine that plaintiff has no claim under this Court's new test.  And when this occurs, I predict this Court will again intervene, staying laser-focused on its quest to allow plaintiff an opportunity to present her claim to a jury.

probation. The majority opinion improperly rejects this holding and remands this case to the trial court to determine "if there is a genuine issue of material fact concerning . . . whether MCL 771.1(1) was or would have been violated . . . ." Yet the majority opinion inexplicably offers no guidance as to the meaning of MCL 771.1(1). Whether the plea and sentence recommendation in fact violated MCL 771.1(1) is a legal determination best resolved by this Court, not the trial court on remand. The Court of Appeals has already directly resolved this question, stating that MCL 771.1(1) "does not explicitly state that a sentence that combines jail time and probation is forbidden."[40] Another panel of the Court of Appeals previously addressed this same question, and concluded that MCL 771.1(1) "does not require a prison sentence for a CSC III conviction."[41] I would likewise resolve this legal question and conclude that it was not a violation of MCL 771.1(1) to recommend a sentence of five years' probation with the first year to be served in the county jail.

In isolation, MCL 771.1(1) precludes a sentence of probation for a CSC-III conviction.[42] But the majority opinion does not consider the fact that CSC-III is

---

[40] *Janetsky I*, unpub op at 8.

[41] *People v Gutierrez*, unpublished per curiam opinion of the Court of Appeals, issued December 23, 2014 (Docket No. 317593), p 5.

[42] MCL 771.1(1) provides:

> In all prosecutions for felonies, misdemeanors, or ordinance violations *other than . . . criminal sexual conduct in the first or third degree, . . .* if the defendant has been found guilty upon verdict or plea and the court determines that the defendant is not likely again to engage in an offensive or criminal course of conduct and that the public good does not require that the defendant suffer the penalty imposed by law, the court may

23

legislatively defined as a Class B offense, MCL 777.16y; MCL 777.64.[43] Class B offenders without a criminal record may receive "an intermediate sanction unless the court states on the record reasonable grounds to sentence the individual to incarceration in a county jail for not more than 12 months or to the jurisdiction of the department of corrections for any sentence over 12 months."[44] Former MCL 769.31(b) defined "intermediate sanction" as "probation or any sanction, other than imprisonment in a state prison or state reformatory, that may lawfully be imposed."[45] At the time the plea deal was offered to Hannahs, MCL 769.31(b) listed specific examples of intermediate sanctions that could lawfully be imposed, such as "[p]robation with jail," MCL 769.31(b)(*iv*), and "[j]ail," MCL 769.31(b)(*viii*).[46] This same reasoning was employed by our Court of Appeals when it concluded that MCL 771.1(1) may provide a trial court with "the discretion to sentence [a] defendant [convicted of CSC-III] to jail instead of prison . . . ."[47] Contrary to plaintiff's assertion, a conviction of CSC-III did not require a sentence in a state prison.

---

place the defendant on probation under the charge and supervision of a probation officer. [Emphasis added.]

[43] To the extent that Boyd believed that CSC-III is a Class C offense, he deemed this error "correctable," without unsettling the plea deal.

[44] MCL 769.34(4)(a).

[45] MCL 769.31, as amended by 2004 PA 220.

[46] MCL 769.31(b) was amended by 2020 PA 395, which removed "probation with jail" as an authorized sentence.

[47] *Gutierrez*, unpub op at 5.

Plaintiff's understanding of MCL 771.1(1) is overly rigid. Plaintiff took the position that Hannahs must still serve a prison sentence in excess of a year, regardless of the time Hannahs served in the county jail, regardless of the guidelines minimum sentence range, and regardless of whether the trial court decided to downwardly depart from the guidelines consistently with the sentencing recommendation. Again, MCL 771.1(1) merely states that defendants convicted of CSC-III cannot be sentenced to probation. A sentence of probation with jail time is different from a sentence solely of probation. Plaintiff has not shown that her understanding of MCL 771.1(1) is reasonable, and it follows that her claim that the plea deal violated MCL 771.1(1) is not reasonable. As a matter of law, there is no question that the plea deal did not violate and therefore could not have violated MCL 771.1(1).

I also disagree that there is a material question of fact regarding the second element of the Court's newly declared public-policy claim—that plaintiff "reasonably and in good faith believed" that she was "remedying or preventing a violation of law." It is true that the limited evidence in the record shows that McColgan authorized plaintiff to seek withdrawal of Hannahs's plea.[48] But McColgan's reliance on plaintiff's representation of

---

[48] Perhaps a more prudent response from McColgan would have been to meet with plaintiff and Boyd to discuss each other's views and ask each whether there exists Michigan caselaw addressing the question. But it also would have been reasonable for McColgan to assume that plaintiff, consistently with her ethical duties and attorney oath, would have properly and thoroughly researched Michigan caselaw before informing him that the plea and recommendation offered by the Chief Assistant Prosecutor was illegal. While no research was conducted before McColgan armed plaintiff with the right to withdraw the sentencing recommendation, it is not only abundantly clear that the accuracy of plaintiff's interpretation of MCL 771.1(1) was, at best, debatable, but it is also crystal clear that Boyd more properly evaluated the case as one that should be pleaded out on a reduced charge. Instead of obtaining a plea from a confessed perpetrator of a sex crime that would require the perpetrator to spend 12 months in jail, serve four additional years of probation, and

the law does not mean that plaintiff's representation was accurate or reasonable. After all, plaintiff also claimed that Hannahs's plea deal violated the CVRA, but that claim was held to lack merit.

Plaintiff overreacted to the news that Hannahs had entered a plea with a sentencing recommendation that departed downward from the expected guidelines minimum sentence range. Rather than make an effort to support the position of the Saginaw County Prosecutor, as articulated by her supervisor, plaintiff advocated against her supervisor. Plaintiff's position was premised on a cursory and myopic reading of MCL 771.1(1). It is noteworthy that plaintiff advocated against the position of Boyd and, by extension, McColgan, without conducting any research into whether Michigan courts had previously interpreted this statutory provision in the context presented in this case. Had plaintiff diligently researched her concerns with regard to MCL 771.1(1), she would have discovered that there was authority allowing for a nonhabitual offender to be sentenced to an intermediate sanction for a CSC-III conviction, such as that contemplated in the plea deal offered by Boyd.[49]

In sum, the uncontroverted evidence reveals that plaintiff was an overly zealous assistant prosecutor who failed to afford even a modicum of deference to her supervisor, the Chief Assistant Prosecuting Attorney, who ran the day-to-day affairs of the office. The uncontroverted evidence further reveals that plaintiff was an attorney who was prone to cut

---

register as a sex offender, the Saginaw County Prosecutor's Office was forced to dismiss the charges all together.

[49] *Gutierrez*, unpub op at 4-6.

corners, whether it be her failure to thoroughly research MCL 771.1(1), her failure to interview the complainant's sister, her failure to timely review and analyze the Google data she subpoenaed, or her failure to timely conduct a forensic examination of the computers she seized early in the investigation. One would think that the only recourse for an attorney with such a record would be the unemployment line, not a suit for wrongful termination. Accordingly, I do not believe the evidence establishes that plaintiff, an ethically bound prosecuting attorney, "reasonably and in good faith" believed that she was "remedying or preventing a violation of law."

I would affirm the holding of the Court of Appeals that only the trial court can violate MCL 771.1(1), and I would additionally hold, contrary to plaintiff's assertion, that MCL 771.1(1) does not require a prison sentence.

### III. INTENTIONAL TORTS

I would also affirm the Court of Appeals' decision as it relates to plaintiff's intentional-tort claims of false imprisonment and assault and battery. The facts of this case do not demonstrate that plaintiff was held against her will for any appreciable amount of time sufficient to create a genuine and material question of fact as to false imprisonment. On June 1, 2015, plaintiff and an intern went to Boyd's office. Boyd asked the intern to leave and then shut the office door. Boyd returned to his chair and asked plaintiff to sit down. She said she didn't want to sit and stood behind a chair that was in front of his desk. According to plaintiff, Boyd was upset that plaintiff was inundating him with trivial updates on cases through text messaging. Boyd apparently preferred discussing cases in person. The argument continued and plaintiff told Boyd that she wasn't going to speak to

27

him without a union representative. She told Boyd that he was hostile, agitated, unprofessional, and inappropriate. The argument escalated, with Boyd claiming that plaintiff was being insubordinate. Plaintiff began to leave the office, and Boyd stood up and walked toward the door and placed his hand near the top of the door while plaintiff reached for the door handle. She let go of the handle without attempting to open the door.[50] Plaintiff agreed with defense counsel's characterization of the argument, admitting that Boyd had yelled at her to sit down and had stated, "[Y]ou're not leaving until you talk to me," and that plaintiff had yelled back, "I'm not one of your football players, I'm not a child," and "I want my union [representative]." The argument was brief, lasting no more than 30 seconds, and ended when Boyd opened the door and called out for a union representative, who promptly arrived. During these 30 seconds, in which plaintiff was also "yelling" at Boyd, she never told Boyd that she wanted to leave the office, and she apparently gave as much as she got in the argument until Boyd facilitated the arrival of a union representative. There was never any physical contact between Boyd and plaintiff,

---

[50] At her deposition, plaintiff testified as follows during questioning by defense counsel:

*Q.* So your hand is on the door handle, Judge Boyd's hand is on the door.

*A.* Correct. Above my head.

*Q.* Did you then attempt to pull the door open?

*A.* No. I turned to face him. So now my hands are not on the door.

While plaintiff may have hedged her testimony to suggest that she was "trying to open the door," that testimony does not undermine her testimony that she did not attempt to open the door.

and upon the arrival of the union representative, all three sat down and had an extended conversation.

The elements of a false-imprisonment claim are (1) an act committed with the intention of confining another; (2) the act directly or indirectly results in such confinement; and (3) the person confined is conscious of the confinement.[51] Simply stated, the facts here do not support a claim of false imprisonment. Rather, this was a stressful office dispute that eroded into a shouting match between two people in a workplace. The dispute was ultimately resolved when cooler minds prevailed. While Boyd had his hand on the door, plaintiff did not attempt to open the door and instead engaged him in a brief (albeit unprofessional) shouting match, resulting in Boyd complying with plaintiff's demand for a union representative, an act that completely undermines any claim of intentional false imprisonment. Significantly, during that brief time, plaintiff never asked Boyd to let her leave the office and never attempted to open the door. She was content to continue arguing with Boyd.

Plaintiff's decision to stay in Boyd's office for an hour-long conversation after the union representative arrived is also telling of plaintiff's state of mind at the time of this altercation. That plaintiff never mentioned to the union representative that she felt "trapped" indicates that she lacked consciousness of any alleged false imprisonment. These facts, along with the very brief period of alleged "confinement" and the fact that Boyd ultimately acceded to plaintiff's request for a union representative to join them, place this case well outside the ambit of a tenable intentional-tort claim of false imprisonment.

---

[51] *Adams v Nat'l Bank of Detroit*, 444 Mich 329, 341; 508 NW2d 464 (1993).

Plaintiff's claim of assault and battery likewise lacks merit. Boyd never touched plaintiff. He placed his hand on the upper portion of his office door when plaintiff allegedly had her hand on the door handle. The majority holds that an assault may be proven on facts showing that "Boyd (1) was physically close to [plaintiff], (2) had been angry with her and agitated during the meeting, and (3) moved his hand past her head in an aggressive manner to strike the door." I disagree.

To establish a claim of assault, plaintiff must show that Boyd possessed "either an intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery."[52] First, and most important, there is no dispute that Boyd intended to hold the door shut; he did not touch the door to batter plaintiff. Plaintiff concedes that there was no physical contact between her and Boyd and that Boyd never touched, bumped, pushed, or swung at plaintiff, nor raised his hand as if to do so. His conduct was not directed toward plaintiff's person, so there is no basis to infer that he intended to commit a battery or place plaintiff in reasonable apprehension of receiving an immediate battery. Second, plaintiff did not claim that Boyd's act of holding the door itself was the basis of an attempted battery or an unlawful act that placed another in reasonable apprehension of receiving an immediate battery. That is, plaintiff did not testify that she feared being struck by Boyd when he placed his hand on the door. Rather, she claimed that she was "fearful that [she] was going to have to fight [her] way out of the room[.]" While plaintiff's alleged fear may have stemmed from Boyd placing his hand on the door,

---

[52] *Mitchell v Daly*, 133 Mich App 414, 427; 350 NW2d 772 (1984).

there is no evidence that the act of Boyd placing his hand on the door itself caused plaintiff to fear an "immediate" battery from Boyd.

Plaintiff's battery claim is more specious. Battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person."[53] The majority holds that the door was " 'something closely connected with [plaintiff's] person' " such that Boyd's intentional touching of the door constitutes a battery.

The majority admits that "[m]erely touching a door that another is touching could not support a claim for battery." Yet the majority concludes that plaintiff established a battery claim on the basis that she "was grabbing the door handle, was physically proximate to it, had some level of control over it, alleged that she could feel the vibration in the handle when Boyd slammed the door, and alleged that she may have been in the process of opening the door before Boyd made contact with it." First, a person who touches a door handle is obviously "physically proximate" to the door. They also can be said to have "some level of control" over the door while in the process of opening it. And if another person were to touch the door at this time, it is not at all surprising that there would be vibrations the other person would feel. Despite the gloss the majority puts on plaintiff's claim, in substance, her claim is not much, if any, different from "[m]erely touching a door that another is touching."

Rather, I believe this case is properly decided under *Clarke v K Mart Corp*,[54] and I would affirm the Court of Appeals' decision on that basis. In *Clarke*, the Court of Appeals

---

[53] *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005) (quotation marks and citations omitted).

[54] *Clarke v K Mart Corp*, 197 Mich App 541, 549; 495 NW2d 820 (1992).

31

stated that "[a] battery occurs when there is a wilful, harmful, or offensive touching of the plaintiff or of an object that is 'attached to the plaintiff and practically identified with' the plaintiff's body."[55]  The panel concluded that an employee snatching a grocery bag out of a store patron's hand supports a claim for battery, but the same employee snatching the bag out of a shopping cart does not.[56]  That ruling is sound and should be applied here.  Boyd did not touch plaintiff or anything connected to her.  Just as a store patron, as described in *Clarke*, would likely feel vibrations emanating from a shopping cart if a grocery bag were taken out of it, plaintiff here was merely touching a door that Boyd touched and felt vibrations.  In either case, there is no battery.

## IV.  CONCLUSION

While I agree with the majority opinion's interpretation of the term "employer" under the WPA, I dissent from the majority's decision to sustain plaintiff's public-policy claim and intentional-tort claims.  For the reasons provided above, I would hold that the Court of Appeals properly rejected these meritless claims.


Brian K. Zahra


HOOD, J., did not participate because the Court considered this case before he assumed office.

---

[55] *Id*., quoting *Espinoza v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991) (brackets omitted).

[56] *Clarke*, 197 Mich App at 543, 549.